527 So.2d 800 (1988)
James William HAMBLEN, Appellant,
v.
STATE of Florida, Appellee.
No. 68843.
Supreme Court of Florida.
June 2, 1988.
Steven L. Bolotin, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Norma J. Mungenast, Asst. Atty. Gen., Tallahassee, for appellee.
GRIMES, Justice.
Pursuant to article V, section 3(b)(1) of the Florida Constitution, we review the unusual case of James William Hamblen, a state prisoner who is condemned  and apparently willing and determined  to die for the murder of a woman whose store he wanted to rob. The case raises an issue never before considered by this court.

THE KILLING
On April 24, 1984, Duval County Sheriff's officers responded to a silent alarm at a Jacksonville boutique. When the officers arrived, they saw a tall, middle-aged man inside the store. At first they thought he was the proprietor or an employee, but when they could not get him to open the *801 locked door, they became suspicious. When he finally emerged, the officers told him that the alarm had summoned them. The man, who later identified himself as James William Hamblen, responded that he was aware of this and stated that he had "just killed a woman inside." In a dressing room, the officers found the partially clothed body of Ms. Laureen Jean Edwards. She had been shot once in the back of her head. Another shot apparently had struck the wall of the dressing room.
Hamblen was arrested, and a .38 caliber automatic pistol was taken from him. The arresting officers reported that Hamblen offered no resistance to arrest and that he was lucid and coherent. At police headquarters Hamblen gave a statement. He said he had driven to Florida from Texas (where, he alleged later, he had murdered an estranged lover). He needed money to park his rental car at the airport, and decided to steal the necessary funds. While driving around the Jacksonville area, one store, the Sensual Woman, caught his eye as a potential target. Finding Ms. Edwards alone in the store, Hamblen pulled his gun and told her he wanted money. She gave him a small amount of cash from her cash drawer. He then told her to go into a dressing room and disrobe. Hamblen told police he had no intention of sexually abusing Ms. Edwards; he only wanted to make it difficult for her to follow him as he made his escape.
According to Hamblen, his pistol fired accidentally in the dressing room as the woman disrobed. Ms. Edwards then told Hamblen she had more money in the back of the store. She said she would take him to it if he would accompany her. As they proceeded toward the rear, he saw her touch a button that he suspected (correctly) was for a silent alarm. Angered that "anybody could be so stupid over so little money," Hamblen ordered her back into the dressing room where he shot her once in the back of the head.
The physical evidence at the scene bore out Hamblen's story. The medical examiner reported that Ms. Edwards died from a single bullet wound from a .38 caliber weapon held at close range. He said that the gun barrel probably touched her head. She had not been sexually abused. Death was virtually instantaneous. Shell fragments and a spent bullet recovered at the scene were determined to have been fired by the gun taken from Hamblen.

THE CRIMINAL PROSECUTION
After a grand jury indicted Hamblen for first-degree murder, his public defender moved for psychiatric examinations. Both doctors reported that Hamblen was competent to stand trial and was legally sane at the time of the offense. Upon receiving news of the doctors' reports, Hamblen asked the court to revoke the appointment of the public defender and allow him to represent himself. He simultaneously announced his intention to plead guilty. The trial judge conducted a hearing according to the requirements of Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and Goode v. State, 365 So.2d 381 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979), to determine Hamblen's fitness for self-representation. The evidence at this hearing showed that Hamblen had had two years of college education, that he understood courtroom procedure, and that he had represented himself while a state prisoner in Indiana. The judge determined that Hamblen met the criteria that enabled him to exercise his right of self-representation, but ordered two assistant public defenders to be in the courtroom as emergency backup counsel.
Hamblen pleaded guilty and waived his right to have a jury consider whether he should be executed. The state introduced evidence concerning the circumstances of the crime. The state also introduced evidence that Hamblen had been convicted of rape in Indiana in 1964. Hamblen asked his standby counsel to cross-examine only one witness, a police records custodian from Indiana. He accepted the state's version of the facts and even conceded one point as to his prior record that the state *802 was having some difficulty establishing.[1] He presented no evidence of mitigating factors and commented that the prosecutor "has correctly assessed my character, and certainly ... has established the aggravated nature of the crime. Therefore, I feel his recommendation of the death penalty is appropriate." Hamblen went on to note that the probation officer, one Chance, had recommended life imprisonment without hope of parole "so that I may reflect upon the senselessness of my crime." Hamblen continued:
Mr. Chance might have a valid point if I were a young man with a whole lifetime ahead of me and with a whole pocketful of hopes and dreams... . But, as a matter of fact, I'm 55, almost 56 years old and I don't harbor any dreams that are going to be realized in this world, and I am not particularly given to reflection. Therefore, it seems to me that Mr. Chance's recommendation in this instance is inappropriate and [the prosecutor] Mr. Bledsoe's, on the other hand, is appropriate.
After reviewing the record, including the psychological reports, the trial judge sentenced Hamblen to death. The judge found three aggravating factors  cold, calculated and premeditated manner, previous conviction of a felony involving violence against another person, and committed in the course of a robbery  and none in mitigation. Hamblen did not take an appeal from the sentence, but the public defender's office was appointed as appellate counsel. After his motion to withdraw was denied,[2] the public defender prosecuted this appeal.

THE ISSUES
Hamblen's appellate counsel raises two issues on appeal, one dealing with philosophical and policy questions, the other based on the particular facts of the case.

Issue 1  The trial court erred in allowing appellant to waive counsel in the penalty phase, where, as a result, there was never any adversary proceeding to determine whether death or life imprisonment was the appropriate penalty.
The first issue involves the friction between an individual's right to control his destiny and society's duty to see that executions do not become a vehicle by which a person could commit suicide. The main thrust of appellate counsel's argument is that the uniqueness of capital punishment demands that a defense to a death sentence be mounted, irrespective of the wishes of the defendant.
Acknowledging that cases in which a defendant would manipulate the system in order to commit suicide are rare, counsel argues that safeguards are necessary to prevent its possibility. He asserts that these safeguards were not present in Hamblen's case because once he fired his lawyer, there was no one to search his background for mitigating evidence and no one to argue mitigation to the court. Since those interests were not protected in the court below, we are urged to remand the case for a new sentencing hearing and direct the trial judge to appoint a lawyer to represent not Hamblen but the state's  or, more precisely, society's  interests in ensuring that the death penalty is imposed properly. Such counsel, similar to a guardian ad litem, would investigate the case and Hamblen's background in hopes of finding mitigating factors with which to persuade the court to spare his life. By allowing Hamblen to waive counsel for the penalty phase, the public defender argues that the trial judge committed reversible error.
In support of this position, counsel cites cases from California and New Jersey which did not involve defendants who were representing themselves but rather involved defendants who had ordered their *803 attorneys to present no evidence in mitigation. Noting that an attorney is more than simply a "mouthpiece," the California Supreme Court in People v. Deere, 41 Cal.3d 353, 222 Cal. Rptr. 13, 710 P.2d 925 (1985), ruled that a defense attorney rendered ineffective assistance of counsel when he acceded to his client's wishes that no mitigating evidence be presented to the judge before sentencing. The court noted that the problem is not that a defendant wishes to die to atone for a crime he admits and regrets but that to allow the state to become his means of suicide "would make superfluous the constitutional requirement that every capital case be reviewed by the Supreme Court and that no judgment of death be executed unless it has been affirmed by this court." Id. at 362, 222 Cal. Rptr. at 17-18, 710 P.2d at 929-30 (citation omitted).
In State v. Hightower, 214 N.J. Super. 43, 518 A.2d 482 (1986), the defendant had been convicted of felony murder. While he protested the finding of guilt, he ordered his attorney not to submit evidence during the penalty phase on the premise that he would rather be executed than spend thirty years in prison. The Superior Court, Appellate Division, reversed the trial judge's order that forced defense counsel to follow his client's orders. The court reasoned that without hearing the evidence allegedly in mitigation, the jury "could have difficulty discharging its statutory, and indeed moral duty." Id. at 45, 518 A.2d at 483.
There are other cases which have reached different results. The most celebrated of these is that of Gary Gilmore, whose execution was the first carried out in this country after the United States Supreme Court resanctioned capital punishment. Following his sentence to death, Gilmore waived his appeal to the Utah Supreme Court. The United States Supreme Court denied an application for stay of execution filed on his behalf, stating that he had made a knowing and intelligent waiver of all federal rights that he might have asserted after his sentence was imposed and that the state's determination of his competence to waive such rights was "firmly grounded." Gilmore v. Utah, 429 U.S. 1012, 1015, 97 S.Ct. 436, 438, 50 L.Ed.2d 632 (1976) (Burger, C.J., concurring).
Also pertinent is the case of Jesse Walter Bishop, who dismissed his attorneys and pleaded guilty to first-degree murder. At the special three-judge sentencing phase, Bishop refused to present any mitigating evidence even though a team of standby public defenders represented that they believed there were mitigating factors, and Bishop admitted that such did exist. The panel recommended the death sentence and the state's supreme court affirmed, Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979). Thereafter, Bishop's standby lawyers filed a federal habeas corpus action. The district court denied the petition, and the court of appeals affirmed. The United States Supreme Court denied an application for stay of execution. Lenhard v. Wolff, 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979).
In People v. Silagy, 101 Ill.2d 147, 77 Ill.Dec. 792, 461 N.E.2d 415, cert. denied, 469 U.S. 1067, 105 S.Ct. 552, 83 L.Ed.2d 439 (1984), the defendant made a voluntary election to represent himself in the penalty phase after the jury had entered a finding of guilt. In rejecting appointed counsel's contention that the waiver of counsel frustrated the statutory intent to provide the sentencing body with all relevant mitigating evidence, the Illinois Supreme Court relied upon Faretta for the "`nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.'" Silagy, 101 Ill.2d at 179, 77 Ill.Dec. at 808, 461 N.E.2d at 431 (quoting Faretta, 422 U.S. at 817, 95 S.Ct. at 2532). The court went on to say:
Nor do we consider, as the defendant says, that his decision to discharge his attorneys interfered with society's interest in the fair administration of justice. The sentencing body is required to give consideration to all mitigating facts in the trial record (People v. Carlson (1980), 79 Ill.2d 564, 589-90 [38 Ill.Dec. 809, 404 N.E.2d 233]) as well as to any mitigating evidence the defendant offers *804 at the sentencing hearing (People v. Lewis (1981), 88 Ill.2d 129, 144 [58 Ill.Dec. 895, 430 N.E.2d 1346]). In Lewis, this court noted that in some instances a defendant may choose not to present evidence during the sentencing phase in aggravation and mitigation. 88 Ill.2d 129, 147 [58 Ill.Dec. 895, 430 N.E.2d 1346]; see Johnson, The Death Row Right to Die: Suicide or Intimate Decision?, 54 S.Cal.L.Rev. 575 (1981).
Society's interest in the proper administration of justice is preserved by giving a defendant the right freely to present evidence in mitigation, by requiring the sentencing body to find aggravating factors before imposing the death penalty, and by requiring that a sentence of death be reviewed by this court. These practices are to assure that the death penalty will not be imposed arbitrarily.
Id. 101 Ill.2d at 181, 77 Ill.Dec. at 808-09, 461 N.E.2d at 431-32.
While we commend Hamblen's appellate counsel for a thorough airing of the question presented by this issue, we decline to accept his logic and conclusions. We find no error in the trial judge's handling of this case. Hamblen had a constitutional right to represent himself, and he was clearly competent to do so. To permit counsel to take a position contrary to his wishes through the vehicle of guardian ad litem would violate the dictates of Faretta. In the field of criminal law, there is no doubt that "death is different," but, in the final analysis, all competent defendants have a right to control their own destinies. This does not mean that courts of this state can administer the death penalty by default. The rights, responsibilities and procedures set forth in our constitution and statutes have not been suspended simply because the accused invites the possibility of a death sentence. A defendant cannot be executed unless his guilt and the propriety of his sentence have been established according to law.
In this case, the trial judge made a thoughtful analysis of the facts. Especially telling was his disagreement with the prosecutor that the killing was heinous, atrocious, or cruel. The judge did not merely rubber-stamp the state's position. He also carefully analyzed the possible statutory and nonstatutory mitigating evidence. It is apparent that the only statutory mitigating circumstance that might have been deemed applicable was that the crime "was committed while the defendant was under the influence of extreme mental or emotional disturbance." § 921.141(6)(b), Fla. Stat. (1983). Opinions relevant to that factor were contained in the psychological report. While both doctors indicated that Hamblen's crime was the result of his psychological makeup, neither's report concluded that Hamblen suffered from an extreme mental or emotional disturbance. Thus, the judge did not err in rejecting this as a mitigating circumstance.
Of course, the common practice in death cases is to introduce evidence of nonstatutory mitigating factors such as the defendant's family background, his work history and the absence of criminal history. Much of this material with respect to Hamblen was contained in the psychological reports. There may have been other factors that Hamblen did not disclose to his doctors, but even if the judge had appointed counsel to argue for mitigation, there is no power that could have compelled Hamblen to cooperate and divulge such information.
We hold that there was no error in not appointing counsel against Hamblen's wishes to seek out and to present mitigating evidence and to argue against the death sentence. The trial judge adequately fulfilled that function on his own, thereby protecting society's interests in seeing that the death penalty was not imposed improperly.

Issue 2  The trial court erred in finding as an aggravating circumstance that the homicide was committed in a cold, calculated, and premeditated manner.
Hamblen's appellate counsel also argues that the judge erred in finding that the homicide was committed in a cold, calculated and premeditated manner and without any pretense of moral or legal justification.
*805 Initially, we note that simple premeditation of the type necessary to support a conviction for first-degree murder is not sufficient to sustain a finding that a killing was committed in a cold, calculated, or premeditated manner and without any pretense of moral or legal justification. Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982). What is required is a heightened form of premeditation which can be demonstrated by the manner of the killing. Those that are executions or contract murders fit within that class. Routly v. State, 440 So.2d 1257 (Fla. 1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 888 (1984).
In Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), the defendant shot the victim in the back during an aborted robbery attempt. There was evidence that two of the three shots struck the victim after he had fallen. Rogers was quoted as saying that "the victim was playing hero and I shot the son of a bitch." In addressing the findings of aggravating circumstances, this Court said:
We also find that the murder was not cold, calculated and premeditated, because the state has failed to prove beyond a reasonable doubt that Rogers' actions were accomplished in a "calculated" manner. In reaching this conclusion, we note that our obligation in interpreting statutory language such as that used in the capital sentencing statute, is to give ordinary words their plain and ordinary meaning. See Tatzel v. State, 356 So.2d 787, 789 (Fla. 1978). Webster's Third International Dictionary at 315 (1981) defines the word "calculate" as "[t]o plan the nature of beforehand: think out ... to design, prepare or adapt by forethought or careful plan." There is an utter absence of any evidence that Rogers in this case had a careful plan or prearranged design to kill anyone during the robbery. While there is ample evidence to support simple premeditation, we must conclude that there is insufficient evidence to support the heightened premeditation described in the statute, which must bear the indicia of "calculation."
Id. at 533.
In the instant case, the evidence does not indicate that Hamblen had a conscious intention of killing Ms. Edwards when he decided to rob the Sensual Woman. It was only after he became angered because Ms. Edwards pressed the alarm button that he decided to kill her. Unlike those cases in which robbery victims have been transported to other locations and killed some time later, e.g., Parker v. State, 476 So.2d 134 (Fla. 1985); Smith v. State, 424 So.2d 726 (Fla. 1982), cert. denied, 462 U.S. 1145, 103 S.Ct. 3129, 77 L.Ed.2d 1379 (1983), Hamblen's conduct was more akin to a spontaneous act taken without reflection. While the evidence unquestionably demonstrates premeditation, we are unable to say that it meets the standard of heightened premeditation and calculation required to support this aggravating circumstance. Notwithstanding, we are convinced that the elimination of this aggravating circumstance would not have resulted in Hamblen's receiving a life sentence. See Bassett v. State, 449 So.2d 803 (Fla. 1984); Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).

CONCLUSION
We affirm Hamblen's judgment and sentence of death.
It is so ordered.
McDONALD, C.J., and OVERTON, SHAW and KOGAN, JJ., concur.
EHRLICH, J., dissents only as to penalty with an opinion.
BARKETT, J., dissents as to the penalty with an opinion, in which EHRLICH, J., concurs.
EHRLICH, Justice, dissenting only as to penalty.
I concur with Justice Barkett's very thoughtful and sensitive analysis of the case at hand where the defendant opts, not as a matter of trial strategy, but for personal *806 reasons, to waive, in effect, the development and offering of evidence in mitigation. I join this position principally because of section 921.141(4), Florida Statutes which provides in pertinent part that "the judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida." So long as this Court has this legislatively mandated responsibility, we must have a meaningful record to review to determine if death be the appropriate penalty. In reviewing the record on the penalty phase, as we do, we must determine if the sentencer, the trial judge, has made a proper analysis of the facts in his findings with respect to the aggravating and the mitigating circumstances. We can rely on the state's establishing the facts to support aggravating circumstances. The question at hand is what does the Court do when the defendant makes the decision not to develop the evidence in mitigation, as the defendant did in this case.
As I view it, we cannot perform our review function without an adequate record of facts which may tell whether death is the appropriate penalty. If a defendant is charged with premeditated murder or felony murder and wishes to plead guilty, the state can have no objection so long as the plea is freely and voluntarily made. But where the penalty may be death, I do not believe the state can permit the death penalty to be imposed by default, and that is the factual scenario at hand.
While I have reviewed the entire record, I cannot truthfully say that death is the appropriate penalty. Sure, on the basis of the record presented I may very well conclude that death is the appropriate penalty, yet I know that because of the defendant's wishes, no effort whatsoever has been made to see if in fact there be anything in mitigation in the defendant's life that may indicate to us, as a reviewing court, that the ultimate penalty should not be imposed in this case. I believe the state has this responsibility under the circumstances presented, for the reasons articulated by Justice Barkett.
BARKETT, Justice, dissenting as to the penalty.
Despite the majority's focus on the application of Faretta, the issue in this case is not a defendant's right to represent himself. Indeed, the public defender representing appellant concedes that appellant has the right to represent himself and does not seek to force counsel upon appellant as a solution to the unusual problem posed here. The core issue, rather, is whether the state has an independent interest in presenting a case for mitigation in those rare instances when the defendant chooses not to present one for himself. Although the majority concedes that the state or society has the obligation not to administer the death penalty by default and to prevent executions from becoming a vehicle by which a prisoner can commit suicide, it fails to address the question of how the state is to meet that obligation in a case such as this. Suggesting, as in this case, that "[t]he trial judge adequately fulfilled [the] function [of seeking out and presenting mitigating evidence]" begs the question. Majority opinion at 804. The fact remains that in an adversarial context no one presented or advocated a mitigating position for the defendant. It seems to me that logic and law dictate the necessity for such advocacy.
Section 921.141(4), Florida Statutes (1985), provides for automatic, mandatory review of every judgment and sentence of death by the Supreme Court of Florida. Indeed, counsel for defendant in this very case moved to withdraw and to dismiss the defendant's death penalty appeal pursuant to his client's wishes. The motion was denied. Why? Because this Court has said unequivocally that
even though [the defendant] expressed a desire to be executed, this Court must, nevertheless, examine the record to be sure that the imposition of the death sentence complies with all of the standards set by the Constitution, the Legislature and the courts.
Goode v. State, 365 So.2d 381, 384 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979).
*807 This compliance requires a weighing of many factors to be sure that the severest of all state penalties is applied, in accordance with the law, only in the most extreme of cases. The purpose of mandatory review would be completely thwarted by the failure to present any information pertinent to the mandated weighing process. In such instances, the mandatory appeal taken to this Court necessarily would be an empty formality and the penalty, a foregone conclusion. This cannot, and should not, be the result in any death penalty case. Otherwise, the state has failed to discharge its responsibility to preserve human life where the law requires it,[*] to ensure the reliability of the death sentence, and to guarantee the integrity of the criminal justice system.
The need for careful judicial scrutiny in cases involving a possible loss of life applies with even greater force when the state itself is the instrument of death. Consequently, stringent procedural and substantive safeguards have been erected to ensure that the state will not take life in an arbitrary or capricious manner and that the death penalty will be reserved for the most heinous of crimes committed by the most depraved of criminals. As Justice Stewart noted,
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
Furman v. Georgia, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).
We recognize that the exigencies of modern society demand compromises. Thus, in noncapital cases, we erect barriers of finality beyond which no court can go despite apparent error or injustice. Where imprisonment is the punishment, we are willing to accept the risk of mistake or arbitrary treatment because of a need for finality due to the sheer number of cases involved.
We are not so willing to accept mistake or arbitrariness, however, when the price is a human life. As Charles Black notes, when death is the punishment the safeguards must be greater because
death is different ... [and] the infliction of death by official choice ought to require a higher degree of clarity and precision in the governing standards than we can practicably require of all choices, even of choices for punishment.
C.L. Black, Capital Punishment: The Inevitability of Caprice and Mistake (1981), at 29-30. Black recognizes that in some sense everything that occurs or is suffered is irrevocable.
But it is a blurred vision indeed that cannot see a radically different kind of irrevocability in death.
Id. at 40. This principle recurs time and again, both expressly and implicitly, throughout our death penalty jurisprudence. As Justice Harlan noted:
So far as capital cases are concerned, I think they stand on quite a different *808 footing than other offenses. In such cases the law is especially sensitive to demands for that procedural fairness which inheres in a civilian trial where the judge and trier of fact are not responsive to the command of the convening authority. I do not concede that whatever process is "due" an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case.
Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148 (1957) (Harlan, J. concurring).
Indeed, the United States Supreme Court repeatedly has recognized that the finality of the death penalty demands enhanced due process. In Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), Justice Stevens observed:
[E]very Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.
Id. at 468, 104 S.Ct. at 3166-67 (Stevens, J., concurring in part, dissenting in part) (footnote omitted). Death must "serve both goals of measured, consistent application and fairness to the accused," Eddings v. Oklahoma, 455 U.S. 104, 111, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982), and must "be imposed fairly, and with reasonable consistency, or not at all." Id. (emphasis added). Accord Hitchcock v. Dugger, ___ U.S. ___, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Eddings; Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). At a minimum, sentencing procedures must be designed so as to ensure that the death penalty will not be "inflicted in an arbitrary and capricious manner." Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). See Furman. See generally Strafer, Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention, 74 J.Crim.L. & Criminology 860 (1983); Note, A Matter of Life and Death: Due Process Protection in Capital Clemency Proceedings, 90 Yale L.J. 889 (1981).
This heightened scrutiny is meaningless, however, if the defendant "waives" any part of the proceedings critical to determining the proper sentence. Without a presentation of mitigating evidence, we cannot be assured that the death penalty will not be imposed in an arbitrary and capricious manner, since the very facts necessary to that determination will be missing from the record. The state's responsibility in this regard cannot be handed over to the accused merely because he wishes to see himself executed.
The doctrine of waiver, therefore, must be deemed inapplicable in cases like this one. I agree with the Pennsylvania Supreme Court which held in Commonwealth v. McKenna, 476 Pa. 428, 439-41, 383 A.2d 174, 180-81 (1978):
We recognize, of course, that the doctrine of waiver is, in our adversary system of litigation, indispensable to the orderly functioning of the judicial process. There are, however, occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure. One such situation is surely the imposition of capital punishment... .
.....
The doctrine of waiver developed not only out of a sense of fairness to an opposing party but also as a means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party had *809 failed to preserve. It was not, however, designed to block giving effect to a strong public interest, which itself is a jurisprudential concern. It is evident from the record that Gerard McKenna personally prefers death to spending the remainder of his life in prison. While this may be a genuine conviction on his part, the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence. Especially is this so where, as here, to do so would result in state aided suicide. The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue  the propriety of allowing the state to conduct an illegal execution of a citizen.
(Footnotes omitted.) See People v. Stanworth, 71 Cal.2d 820, 457 P.2d 889, 80 Cal. Rptr. 49 (1969) (no right to waive appeal because the interests of society require assurance that trial and sentencing have been carried out justly); Massie v. Sumner, 624 F.2d 72 (9th Cir.1980) (unable to waive automatic appeal to California Supreme Court of imposition of death penalty), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981).
How then can we accommodate society's need for the information necessary to make an informed judgment as well as a defendant's right to represent himself or remain silent? The compromise suggested by Hamblen's appellate counsel appears to be a sensible and viable solution in these rare cases. Hamblen's attorney does not suggest that his client be precluded from exercising his constitutional right to represent himself. Rather, he argues that separate public counsel be appointed to present the case for mitigation. I agree with this proposal. Reliability in imposing the death penalty, in my opinion, can be achieved only in the context of a true adversarial proceeding. Appointing independent public counsel to present whatever mitigating factors reasonably can be discovered under the circumstances of a given case would satisfy society's need for a reliable and proportionate sentence without infringing upon the defendant's right of self representation.
Therefore, I would remand for a new sentencing proceeding before a jury with instructions that the trial court appoint public counsel to advocate mitigation.
EHRLICH, J., concurs.
NOTES
[1] It was a purely technical matter concerning whether James William Hamblen, the name under which Hamblen had been arrested and indicted in Florida, and James William Hamblen, Jr., who had been imprisoned in Indiana for rape, were the same person. Hamblen announced to the court that he dropped the Jr. from his name when his father died and that it was he who had been convicted of rape in Indiana in 1964.
[2] Hamblen made it clear that he did not want the case appealed.
[*] The state clearly has a significant interest in preserving human life. Courts have said that such an interest derives from the most fundamental sources of law. Corbett v. D'Alessandro, 487 So.2d 368, 371 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla. 1986). Thus, the state, affirming in a collective sense the value of life, has in a multitude of ways recognized its duty to preserve life. In a civil context, for example, courts have approved laws requiring occupants of vehicles to wear safety belts and motorcycle drivers to wear helmets. See Kingery v. Chapple, 504 P.2d 831 (Alaska 1972); State v. Lombardi, 110 R.I. 776, 298 A.2d 141 (1972). And, in the line of cases dealing with the rights of terminally ill patients, we have rejected the view that government should never intrude. Instead, in cases ranging from those involving a refusal of continued medical treatment to euthanasia, we have carefully weighed and balanced competing interests. Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), aff'g 362 So.2d 160 (Fla. 4th DCA 1978). See also Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 743 n. 11, 370 N.E.2d 417, 426 n. 11 (1977). See generally Annas, Reconciling Quinlan and Saikewicz; Decision Making for the Terminally Ill Incompetent, 4 Am.J.L. & Med. 367, 373-74 n. 19 (1979); Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L.Rev. 1 (1975); Note, Suicide and the Compulsion of Lifesaving Medical Procedures: An Analysis of the Refusal of Treatment Cases, 44 Brooklyn L.Rev. 285 (1978).