676 So.2d 966 (1995)
Aileen C. WUORNOS, Appellant,
v.
STATE of Florida, Appellee.
No. 81466.
Supreme Court of Florida.
September 21, 1995.
Rehearing Denied June 5, 1996.
*967 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, and Margene A. Roper, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Aileen C. Wuornos. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Charles E. Carskaddon was last seen alive on May 31, 1990, when he left home on a trip to Tampa in his Cadillac. His body was found in Pasco County on June 6, 1990, in a secluded area. The remains were covered by an electric blanket and a large amount of uprooted tall grass. His vehicle and its contents were found in a separate location on June 6 or 7, 1990. At this time the car apparently was red-tagged by the Florida Highway Patrol and ultimately was towed away on June 13. Sheriff's officers later recovered it.
The body was badly decomposing when found. The medical examiner determined that Carskaddon had died of gunshot wounds. Eight ".20 caliber" bullets were recovered from the body, and the examiner testified that all eight bullets were in regions that could cause death. She could not say which was the fatal bullet. The true height and weight of Carskaddon at the time of death also could not be determined due to decomposition.
Witnesses had seen Aileen Carol Wuornos in possession of Carskaddon's car. Wuornos had pawned a gun identified as belonging to Carskaddon. She also faced charges in several similar murders involving men found dead along the highways of the Central Florida region.
At trial, Wuornos indicated her desire to plead guilty. She complained of unjust pretrial publicity and continued to claim she had killed all of her victims in self-defense. The trial court explained that a guilty plea would eliminate any possibility of relying on self-defense, but Wuornos said she wanted to plead guilty anyway. She asserted she could not get a fair trial. The trial court accepted Wuornos' plea as knowing, intelligent, and voluntary with assistance of competent counsel. A July 14, 1992, date then was set for the penalty phase of trial.
When that date arrived, defense counsel presented a letter from Dr. Harry Krop stating that Wuornos was delusional and incompetent to proceed with trial. The trial court then ordered Wuornos evaluated by Dr. Donald DeBeato and Dr. Joel Epstein. These last two found that Wuornos was competent to stand trial but that she suffered from a personality disorder. Based on these conclusions, the trial court found Wuornos competent to proceed.
In a later hearing, Wuornos informed the trial court that she intended to waive her right to a penalty-phase jury, the right to present mitigating evidence, and her right to be present. The trial court asked defense *968 counsel what mitigating evidence would have been presented. Defense counsel indicated that there would have been arguable evidence of borderline and antisocial personality disorders, emotional distress, impaired capacity, a colorable claim of self-defense, and various nonstatutory factors.
Nevertheless, Wuornos continued to assert her desire to waive presentation of mitigating evidence. She explained that she already had five death sentences and complained that male serial killers only received about two death sentences. She said she didn't care anymore and just wanted to return to death row. Wuornos also rejected the trial court's recommendation that she allow the presentation of mitigating evidence. Based on these factors, the trial court found that Wuornos had waived her right to present mitigation, to have a trial by jury, and to be present during the penalty phase. The defense also waived any objection to the presentation of collateral crimes evidence. In aggravation, the State presented detailed information about several of the other murders and felonies for which Wuornos had been convicted.
The State urged the trial court to find three aggravating factors: prior violent felonies, murder committed during a robbery, and cold and calculated premeditation. The State waived pecuniary gain and witness elimination as possible aggravators.[1] Defense counsel presented no evidence, in keeping with his client's wishes. But he did make closing argument urging the trial court to consider the evidence already in the record of borderline and antisocial personality disorders, a troubled youth, abuse of drugs and alcohol, being lured into prostitution at an early age, and other factors.
At sentencing, Wuornos complained vehemently and profanely about mistreatment. The trial court ultimately threatened to bind and gag her unless she remained quiet, but she was permitted to address the court. In her statement, Wuornos again complained about the sensationalized publicity surrounding her case and asserted she had acted in self-defense.
The trial court found all three aggravating factors asserted by the State. As to mitigating evidence, the trial court found that none existed, either statutory or nonstatutory, and that even if mitigators existed, the case for mitigation was minimal in comparison with the case for aggravation. The trial court specifically rejected Wuornos' claim of self-defense, then sentenced her to death.
As her first issue, Wuornos argues that her guilty plea was improperly taken by the trial court below. It is true that Wuornos failed to move to withdraw her plea, but the failure does not work a procedural bar in the context of a death-penalty case. As we have noted elsewhere, this Court is absolutely required to review the propriety of the judgment of conviction in death-penalty cases, and that duty cannot be defeated by the procedural bar that would apply in judgments resulting in lesser sentences. Koenig v. State, 597 So.2d 256 (Fla.1992). Accordingly, we proceed to the merits of this issue.
We have read the colloquy between Wuornos and the trial court resulting in the acceptance of the guilty plea, and we agree with Wuornos that it failed to meet the standards set by Florida Rule of Criminal Procedure 3.172. This resulted partly from the somewhat combative responses Wuornos herself gave to the court after being placed under oath,[2] and her continued and contradictory assertions that she (1) was guilty and wanted to abandon her right to trial, and (2) that she acted in self-defense in the killing. In particular, the colloquy failed to inform Wuornos of mandatory minimum and maximum penalties, *969 [3] some of the specific trial-related rights she was waiving,[4] her continuing right to collateral review of the conviction,[5] the possibility of perjury charges for untruthful statements to the court,[6] and the possibility of deportation if she were not a United States citizen.[7]
The better procedure is for the trial court to use rule 3.172 as a checklist during the plea colloquy, and we strongly encourage judges to follow this practice. Nevertheless, the rule itself states:
Failure to follow any of the procedures of this rule shall not render a plea void absent a showing of prejudice.
Fla.R.Crim.P. 3.172(i). Florida case law is in accord. Judge Ervin of the First District correctly noted in Fuller v. State, 578 So.2d 887, 889 (Fla. 1st DCA 1991), quashed on other grounds, 595 So.2d 20 (Fla.1992):
In the absence of an allegation of prejudice or manifest injustice to the defendant, the trial court's failure to adhere to rule 3.172 is an insufficient basis for reversal.
In sum, there is no possibility of error absent an allegation and showing of prejudice.
We are mindful of the requirements set by Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), which was one reason rule 3.172 was developed and promulgated. In Boykin, the United States Supreme Court quoted with apparent approval the following statement of the Pennsylvania Supreme Court:
A majority of criminal convictions are obtained after a plea of guilty. If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, inter alia, an attempt to satisfy itself that the defendant understands the nature of the charges, his right to jury trial, the acts sufficient to constitute the offenses for which he is charged and the permissible range of sentences.
Id. at 244 n. 7, 89 S.Ct. at 1713 n. 7 (quoting Commonwealth ex rel. West v. Rundle, 428 Pa. 102, 105-06, 237 A.2d 196, 197-98 (1968)). While we commend this language to the trial courts of Florida, we nevertheless must recognize that it is not couched in terms of mandate but of suggestion. Moreover, the facts in Boykin were substantially different from those we face today: In Boykin, the defendant, an Alabama black man, was facing the death penalty not for murder but for several acts of common law robbery occurring in 1966a draconian penalty that may well have influenced the Boykin Court.[8] Moreover, the record indicated that Mr. Boykin's plea was accepted without any inquiry as to whether he realized he thereby faced the death penalty, nor was there any indication defense counsel had so informed Mr. Boykin.
Wuornos' case is quite different. A detailed factual basis to accept the plea was provided by the State without objection from Wuornos, and it clearly met the requirements of Rule 3.172(a). The colloquy between the trial court and Wuornos is not a model, but it nevertheless is apparent from the overall thrust of the conversation that Wuornos knew the import of her plea. The fact that a defendant is combative or makes apparently contradictory assertions is not itself sufficient reason to reject the plea: We recognize that defendants unschooled in legal niceties may well misuse legal terms of art such as "self-defense," as Wuornos did here, and may engage in conduct that does not comport with usual courtroom standards. This conclusion is only underscored by the defense attorney's comments made in the presence of Wuornos and without contradiction by her:

*970 Ms. Wuornos understands specifically that she's giving up the right to claim self-defense. She understands she's giving up the right to claim involuntary intoxication as a defense, and she understands that she's giving up the right to insanity at the time, the offense as a reason. She understands those things. If you care to question her on it, you will find that she understands exactly what is happening here and she is competent to make these decisions.
....
I can represent to this court this woman is not insane. She understands what's going on and she is in full control of her mental faculties.
Wuornos herself made the following remarks under oath:
I understand everything, and as far as I'm concerned, I'm tired of the re-electorial scandals of trying to take these cases to court. And I've got three death sentences already that I'm not going to get appealed. I got one that may be appealed, very good appeal, and this one is silly, and I just don'tI know everything. Guilty.
In addition, the record before us contains a detailed form signed by Wuornos, her counsel, and the trial court. This form clearly meets all the requirements imposed by law, and the trial court upon inquiry established that Wuornos knowingly and voluntarily signed it. In addition, the trial court on the record asked Wuornos to initial several interlineations made in the document, which Wuornos did.
The obvious evil addressed by the United States Supreme Court in Boykin was of poorly advised defendants unwittingly subjecting themselves to death penalties by a guilty plea, or of facts that simply do not merit a death penalty. We believe that this is the type of "prejudice" contemplated by rule 3.172(i). Here, however, the record substantially and competently supports the trial court's finding of a basis to accept the plea. Wuornos herself indicated she was aware of the penalties she faced, knew the rights she was abandoning, and voluntarily had agreed to plead guilty. Although the procedures used below were not the most desirable, they nevertheless did not prejudice Wuornos within the meaning of rule 3.172(i). The record refutes any contention she was poorly advised or unwittingly subjected herself to the death penalty, and the facts here are of a kind that would warrant the death penalty in a full trial.[9] Accordingly, the deviations from the rule did not rise to the level of error.
As her second issue, Wuornos argues that her waiver of rights in the penalty phase should be invalid for the reasons stated in Justice Barkett's dissent in Hamblen v. State, 527 So.2d 800, 805-09 (Fla.1988) (Barkett, J., dissenting). We disagree. A majority of this Court has never embraced Justice Barkett's views. To the contrary, we have held that "[a]t the trial level, the defendant is entitled to control the overall objectives of counsel's argument," including a waiver of the right to present a case for mitigation. Farr v. State, 656 So.2d 448, 449 (Fla.1995). We do note that the trial court did not order a presentence investigation here. While we have encouraged such a practice, we have not required it. Id. Therefore, we find no error on this point.
Third, Wuornos contends that her behavior during the penalty phase was sufficiently "irrational" that the trial court erred in not ordering a new competency evaluation. We have read the record of the proceeding and do not find that Wuornos' conduct reached a level that should have triggered renewed evaluation. Wuornos' statements, while profane and disruptive, nonetheless were rationally organized toward a goal of conveying several impressions: that she was being mistreated by guards, that she could not receive a fair trial, and that she had been unfairly subjected to more trials than male serial killers such as Ted Bundy, among other matters. It is clear from the overall exchange that, although angry, Wuornos was *971 capable of understanding what was happening and of interacting in a meaningful way in the proceedings. Only if she showed a lack of such capacity, we believe, would the trial court be obligated to order a renewed competency evaluation.
As her fourth issue, Wuornos argues that the State failed to prove the aggravating factor of cold, calculated premeditation. We agree with Wuornos that the trial court relied entirely upon collateral crimes evidence to prove the existence of this factor when the sole relevance of this evidence was to establish bad character or propensity. Finney v. State, 660 So.2d 674, 681 (Fla.1995). The trial court stated as much in its sentencing order:
Charles Carskaddon was not the first of Miss Wuornos' murder victims. The evidence indicates that by the time Miss Wuornos killed Mr. Carskaddon she had a well established pattern of selecting white, middle-aged male victims, luring them to a secluded area with promises of sex, shooting them multiple times in the torso, and stealing their money, car and all other personality [sic] in their possession. The theft of Mr. Carskaddon's property did not occur spontaneously following the killing. Miss Wuornos carefully and calculatingly selected this victim, stalked him and lured him to a secluded area with the intent of killing and robbing him.
Apart from the improper use of collateral crimes evidence to prove bad character or propensity, nothing in the record supports the last two sentences of this quotation. There were no witnesses to the killing of Carskaddon, and Wuornos' confessions in themselves do not support the existence of cold, calculated premeditation. Accordingly, the trial court erred in finding this aggravating factor. We will evaluate the effect of the error below, in our consideration of mitigating evidence.
Fifth, Wuornos contends that the felony-murder aggravator fails to sufficiently narrow the class of death-eligible defendants and duplicates elements of first-degree murder. This argument is without merit. Johnson v. State, 660 So.2d 637 (Fla.1995); Johnson v. State, 660 So.2d 648 (Fla.1995).
As her sixth issue, Wuornos alleges that the trial court erred in failing to find and weigh a variety of mitigating factors. In its findings, the trial court concluded that no mitigators existed and that, even if they did, they would not outweigh the case for aggravation. We must begin by noting that Wuornos' refusal to present a case for mitigation constitutes an admission of her belief that no such case exists. This concession is not necessarily binding on the trial court, especially where the record includes uncontroverted facts that unquestionably constitute mitigating evidence. Nevertheless, Wuornos' actions effectively weakened any case for mitigation because they tended to create a conflict in the record properly left to the finder of fact to resolve. To this extent we find no error in the trial court's actions.
Nevertheless, we cannot overlook the fact that the reports by psychological experts who examined Wuornos all agree on one point: that she suffers a personality disorder. Moreover, the State itself notes on appeal that Wuornos' disruptive conduct during the proceedings below was consistent with the existence of such a disorder. For this reason, we believe the trial court erred in not expressly finding and weighing Wuornos' personality disorder.[10] However, the record is conflicting on the true extent of this disorder, which would justify the finder of fact in also concluding that Wuornos' disorder was not significant.
We now must consider whether the errors in finding and weighing aggravators and mitigators require remand. Although this Court does not itself reweigh the evidence on appeal, we nevertheless apply the principle of harmless error where there is no possibility the errors contributed to the outcome. Remand is necessary only where we find that the errors reasonably may have contributed to the outcome.
*972 Except for Wuornos' refusal to present a case for mitigation, we might be inclined to order a remand here. However, Wuornos effectively conceded her belief that no case for mitigation exists. Two strong aggravators remain and clearly were valid,[11] whereas the mitigating evidence of her personality disorder was at best minimal. There is no conclusion other than that the errors here did not contribute to the outcome. Accordingly, the error was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Seventh, Wuornos argues that death is not proportionate in this instance. We find this argument without merit. See Wuornos v. State, 644 So.2d 1012 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1708, 131 L.Ed.2d 568 (1995); Wuornos v. State, 644 So.2d 1000 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1705, 131 L.Ed.2d 566 (1995). Having independently reviewed the record for other errors and finding none, the judgment and sentences are affirmed.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN and ANSTEAD, JJ., concur.
HARDING and WELLS, JJ., concur as to the conviction and concur in result only as to the sentence.
NOTES
[1] For this reason we reject the State's request that we consider witness elimination notwithstanding the trial court's penalty-phase findings. The State relies on DeAngelo v. State, 616 So.2d 440 (Fla.1993), on this point, but we find that opinion inapposite. In DeAngelo, the State actually filed a cross-appeal challenging the failure of the trial court to find an aggravator. Id. at 442. No such cross appeal was filed here because the State obviously failed to preserve any error.
[2] Among other things, Wuornos complained bitterly about an alleged inability to obtain a fair trial in Florida, about press accounts of the killings, and about a movie portraying the various killings in which she was implicated. The trial court noted at one point that Wuornos was "making it very difficult if not impossible for this court to accept your plea."
[3] See Fla.R.Crim.P. 3.172(c)(1).
[4] See Fla.R.Crim.P. 3.172(c)(3).
[5] See Fla.R.Crim.P. 3.172(c)(4).
[6] See Fla.R.Crim.P. 3.172(c)(6).
[7] See Fla.R.Crim.P. 3.172(c)(8). While it is true Wuornos was a citizen, the rule nevertheless requires that the trial court inform every defendant of the possibility of deportation if they lack citizenship. Id.
[8] There can be no question that, under present-day law, Mr. Boykin's death sentences would have been unconstitutional on other bases apart from the Supreme Court's holding.
[9] We stress, however, that Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), effectively presumes prejudice if the record is wholly silent as to the basis of the plea. The Boykin majority read in light of the dissent indicates that, on this question, appellate courts may not look beyond the four corners of the trial record. Thus, a remand for an evidentiary hearing is not a possibility.
[10] The trial court may have tacitly considered this mitigating factor in its alternative holding as to mitigation.
[11] We reject Wuornos' contention that the "murder committed in the course of a robbery" factor was not properly established. The theft of Carskaddon's gun and automobile created a question for the finder of fact, which has been resolved against Wuornos. We expressly note that the trial court's findings as to this factor did not rely on collateral crimes evidence from the other murder to prove the factor, which would have been improper.