701 So.2d 329 (1997)
Dan Patrick HAUSER, Appellant,
v.
STATE of Florida, Appellee.
No. 87580.
Supreme Court of Florida.
September 18, 1997.
Rehearing Denied November 13, 1997.
Nancy A. Daniels, Public Defender and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Richard B. Martell, Chief, Capital Appeals, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Dan Patrick Hauser. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Hauser was indicted for first-degree murder, pled nolo contendere, and stipulated to the following facts. Melanie Rodrigues, an exotic dancer at Sammy's on the Island in Fort Walton Beach, left work at 2 a.m., January 1, 1995, and did not report for work later that day. Her partially nude body was found two days later beneath a bed in Room 223 of the EconoLodge near Sammy's. She had been strangled. Motel records showed that Room 223 had last been rented to Hauser, and when he was arrested the following month in Nevada, Hauser told police that he had been in Fort Walton Beach at the time of the murder, had visited several bars that night, but could not recall the latter part of the evening because he had been too drunk. Rodrigues' car keys, house key, and underpants were found in his truck. Additionally, his fingerprint was found on a cigarette package next to her body.
At the plea hearing, Hauser admitted his guilt and the judge accepted his plea. Prior to sentencing, Hauser submitted a written request to meet with Investigator Griggs. When Griggs went to the jail, Hauser handed him a handwritten note containing the following statement:
On Dec. 31st at around 4:00 p.m. I started going to the local bars looking for a girl I could get to come back to my room. I went to all the strip joints in the area, but spent most of my time at Sammy's on the Island. When I first went to Sammy's I noticed one girl who seemed new and a little uneasy. So I kept up with what she was doing. For a few hours I had her and a couple other girls dance for me and also sat at the stage. I left and started going *330 to the other clubs and bars, but there wasn't anything going on anywhere else so around 12:00-12:30 am I went back to Sammy's. I knew Satin had to have cash, I had given her around $100-150 during the night. After watching her for a while I knew if there was going to be anyone who I could get back to my room this would be the one. She was small, easy to overpower and new yet still making money.
For the next few hours I had her and a couple of other girls dance for me, then at around 2:00-2:30 I asked her if she wanted to make a couple hundred dollars to come back to my hotel room with me....
... We went inside and she took off her clothes and started to dance, after dancing for awhile she came over to where I was sitting on the bed and grabbed at my pants, so I stood up and took off my clothes and we got onto the bed and had sex. We lay in bed for awhile then she got up and danced a little longer then had sex again. She lay next to me for around 30-45 minutes then said she had to get going home. So I stood up at the end of the bed and asked her to give me a hug. I was standing there in front of her thinking this is my last chance, if I want to kill her I am going to have to do it now! So just as we pulled apart I put my hands around her neck and threw her on the bed. I came down on top of her waist and pinned down her arms with my elbows. I put only enough pressure so she could not scream. I wanted to watch the fear in her eyes. I let up so she could take a breath and just stared at her while she started to lose consciousness, then let her breathe again and said well this is it. I put as much pressure as I could and held it until she gave this shake and her body tensed up then went limp. To make sure she was dead I didn't let go for awhile. I put my ear to her chest to make certain I couldn't hear a heart beat.
After reading the statement, Griggs conducted a tape-recorded conversation with Hauser concerning the statement.
At the penalty proceeding,[1] the State presented the medical examiner's testimony, Hauser's handwritten statement, the recorded conversation, and a transcript of the conversation. Hauser announced that he had instructed his lawyer not to present mitigating evidence and defense counsel made an oral proffer of potential mitigation that could have been investigated. A presentence investigation report (PSI) was completed, and the court heard victim impact evidence from Rodrigues' mother and grandmother. The court sentenced Hauser to death, finding three aggravating circumstances,[2] one statutory mitigating circumstance,[3] and four nonstatutory mitigating circumstances.[4] Hauser raises three issues.[5]
The trial court in its written order accepted the proffered mitigation as proven and Hauser now claims that the court erred in failing to also acknowledge each possible mitigating circumstance contained in the PSI. We disagree.
This Court has ruled that where a defendant seeks death the sentencing court must give good faith consideration to the mitigation contained in the record:
We repeatedly have stated that mitigating evidence must be considered and weighed when contained anywhere in the record, to the extent it is believable and uncontroverted. *331 That requirement applies with no less force when a defendant argues in favor of the death penalty, and even if the defendant asks the court not to consider mitigating evidence.
Farr v. State, 621 So.2d 1368, 1369 (Fla.1993) (citations omitted).
In the present case, the trial court's sentencing order comports with Farr. In fact, the trial court bent over backwards to give full consideration to the proffered mitigation, accepting it as proven. Although the order does not specifically mention the PSI, it does show a thoughtful and deliberate weighing of aggravating and mitigating circumstances, and much of the data contained in the PSI was cumulative to information addressed in the order. We conclude that the court gave good faith consideration to the mitigation contained in the record. Cf. Robinson v. State, 684 So.2d 175 (Fla.1996) (reversal required where trial court refused to consider mitigation in the record, including PSI). We find no error.
As noted above, after Hauser had entered his plea but before he was sentenced, he called Investigator Griggs to his cell and handed him a handwritten note describing the murder. Griggs read the statement and then he and Hauser "had a general conversation" about the note, which Griggs taped. The tape was taken into consideration by the trial court in evaluating one aggravating circumstance[6] and one mitigating circumstance.[7] Hauser claims as his second point that the trial court erred in considering his taped statements because Griggs did not warn him pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before the conversation. We disagree.
Miranda warnings were formulated to assist uncounseled suspects in dealing with the inherently coercive atmosphere of police-initiated custodial interrogation.[8] The present case differs from Miranda in key respects: 1) Hauser had entered a plea on the charge and it had been accepted; 2) Hauser was fully represented by counsel on the charge; and 3) Hauser initiated the conversation. The concerns underlying Miranda are not implicated on these facts, and Hauser has waived any other argument on this point.[9] We note that Hauser stated several times on the tape that he was speaking of his own "freewill"[10] and that he was "totally aware" that "some of this will wind up in court at [the] sentencing hearing." The record reveals no trace of coercion. See Traylor v. State, 596 So.2d 957, 965 (Fla.1992) ("We adhere to the principle that the state's authority to obtain freely given confessions is not an evil, but an unqualified good."). We find no error.[11]
Hauser claims as his last point that this Court should recede from Hamblen v. State, 527 So.2d 800 (Fla.1988), in which we held that a capital defendant can waive the appointment of counsel to investigate and present *332 mitigating evidence. Hauser asserts that this ruling is inconsistent with Klokoc v. State, 589 So.2d 219 (Fla.1991), wherein we ruled that, regardless of a defendant's contrary wishes, appellate counsel in a capital case must "proceed to prosecute the appeal in a genuinely adversary manner, providing diligent advocacy of appellant's interests." Id. at 222 (quoting earlier order denying motion to dismiss appeal). We have already decided this issue adversely to Hauser. See, e.g., Farr v. State, 621 So.2d 1368 (Fla.1993). We find no error.
In conclusion, we find the judgment is adequately supported in the record and the death sentence is proportionate. We affirm the judgment and sentence of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs with an opinion in which KOGAN, C.J., and SHAW, J., concur.
ANSTEAD, Justice, concurring.
This Court has consistently refused to reconsider its holding in Hamblen v. State, 527 So.2d 800 (Fla.1988), permitting a defendant to default and thereby limit the presentation of relevant evidence during the penalty phase of a capital proceeding. However, because of the compelling interest of the State of Florida in the integrity of the death penalty decision process, I am now convinced that the State itself has an obligation to see that mitigating circumstances are investigated and evidence thereof produced in order that a rational penalty decision may be made at trial and on appeal in capital cases. Justice Ehrlich's comments in Hamblen say it best:
As I view it, we cannot perform our review function without an adequate record of facts which may tell whether death is the appropriate penalty. If a defendant is charged with premeditated murder or felony murder and wishes to plead guilty, the state can have no objection so long as the plea is freely and voluntarily made. But where the penalty may be death, I do not believe the state can permit the death penalty to be imposed by default, and that is the factual scenario at hand.
527 So.2d at 805-06 (Ehrlich, J., dissenting as to penalty). A process that permits death to be imposed by default obviously impairs the ability of the trial jury and judge to make a proper and reasoned decision as to whether the ultimate penalty of death is an appropriate penalty in a particular case. What this means, in fact, is that the irrationality of a defendant in defaulting will be allowed to infect, and render equally irrational and arbitrary, any decision predicated on the default. Further, this Court obviously cannot carry out its mandatory obligation to conduct a reasoned proportionality analysis of the penalty on appeal where there has been a default in the trial court.
It is also interesting to note that we are not the only ones struggling with this problem. At the same time Justice Ehrlich was expressing his concerns, Justice Linde of the Oregon Supreme Court was writing:
The court's responsibility is not merely to the defendant; it is to the law that limits the unique penalty of death.
The point of "automatic" Supreme Court review is not to save a defendant the trouble of filing an appeal and, if necessary, a petition for review. The point is not to give a defendant the opportunity to save his life, if he has the desire and the help of competent counsel to do so. An ordinary appeal does that much. Nor is it to prevent a defendant's state-assisted "suicide." The point of assuring that this court must automatically review every death sentence case is to make certain that the death penalty is imposed and executed only by the criteria and within the bounds set by the law itself and by the Oregon and United States Constitutions. The Supreme Court of Pennsylvania relied on that state's similar provision for "automatic review" to invalidate a death sentence even when a defendant expressly refused to challenge it, holding that the "overwhelming public interest" in insuring that capital punishment comports with constitutional requirements and the "irrevocable finality" of the death sentence made review of its validity "imperative." Commonwealth v. *333 McKenna, 476 Pa. 428, 440-441, 383 A.2d 174, 181 (1978).
Automatic review under the death penalty measure therefore is not primarily an act of concern for a defendant who may merit little concern and demand none at all. The defendant is not allowed to waive review. It is not sympathy with a killer that explains the vigils outside prisons when the state schedules the execution of one of its people. Because the court's duty is to assure that the state puts no one to death unless the sentence qualifies under all criteria of the law, the court needs a record on which the relevant issues can be determined and, to the extent that they depend on facts, have been properly determined in the circuit court. This cannot be done if a defendant, by refusing counsel or reducing them to the role of "advisers" and pleading guilty, eliminates potential legal and factual issues from proper determination by the court or jury. These issues are important to others than the defendant.
....
Review of even one death sentence case is a heavy burden; review of many will be unbearable unless the cases are tried with as much professional skill and care as the legal system can muster. The backlog of appeals in states where the death penalty has existed longer can approach levels where conscientious supreme court judges have little time for the many other important issues demanding their attention. The pressure will mount to deal with death sentence review as with ordinary appeals, to examine a death sentence case only for trial court "error" properly objected to, preserved and raised on appeal, and to dismiss more errors as "harmless," as already shown by the majority's treatment of the trial court's failure to correct the prosecutor's final jury argument in this case. See supra, 305 Or. at 211, 752 P.2d at 1195. This does not provide the degree of certainty that a death sentence was properly imposed that the provision for Supreme Court review is supposed to assure.
The demand for certainty has other roots than sympathy for a convicted murderer, as sometimes seems to be thought. The higher statutory and constitutional standards for capital cases also reflect the fact that executions at the hand of a state's public officials implicate the state's citizens in an act that many find morally repugnant. It therefore is not a defendant's privilege to volunteer for conviction of a capital offense and to prevent an adequate test of the prosecution's case for the death sentence, as defendant did in this case. Article I, section 11, of the Oregon Constitution may not prevent a confession to the facts in open court, but I would hold that it prevents a guilty plea when the prosecution seeks the death penalty, as explained in Part III of this opinion. A defendant's right to present his own defense does not deny the state the means to assure that the prosecution's case is tested in a professionally qualified adversary manner. That did not occur here.
State v. Wagner, 305 Or. 115, 752 P.2d 1136, 1182-83, 1198-99 (1988)(Linde, J., dissenting).
The views of Justice Linde and Justice Ehrlich become even more compelling when we consider that all we are being asked to do is provide competent counsel during capital sentencing proceedings in all capital cases without waiver, just as we do in appellate proceedings in all capital cases without waiver. In fact, we would be imposing no additional demands on state resources, since a defendant is already entitled to such counsel, and we would be gaining enormously by ensuring the integrity of the death penalty process, an obligation that already rests upon our shoulders.
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] Hauser waived a sentencing jury.
[2] The court found the following: 1) the crime was committed for pecuniary gain; 2) the crime was committed in a cold, calculated, and premeditated manner (CCP); and 3) the murder was especially heinous, atrocious, or cruel (HAC).
[3] The court found that Hauser had no significant history of prior criminal activity.
[4] The court found the following: 1) Hauser had a good attitude and conduct in jail; 2) Hauser cooperated fully with police; 3) Hauser was under the influence of drugs or alcohol; and 4) Hauser had emotional or mental health problems since he was fourteen years old.
[5] Hauser claims that the court erred in the following matters: 1) in failing to properly consider mitigating evidence; 2) in considering Hauser's statement to Griggs that had been obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and 3) in imposing a sentence of death pursuant to Hamblen v. State, 527 So.2d 800 (Fla.1988).
[6] The trial court based its finding of CCP in part on the taped conversation. The court noted that Hauser said on the tape that he had decided at 4 or 5 p.m. to kill someone, that he had a longstanding urge to kill, that the circumstances were right for a killing, and that he committed the murder to feel the "satisfaction" of killing.
[7] When evaluating the fourth proffered mitigating circumstance (i.e., "the Defendant was under the influence of drugs or alcohol"), the trial court took into consideration both the handwritten statement and taped conversation.
[8] See Miranda, 384 U.S. at 444, 86 S.Ct. at 1612 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").
[9] Hauser also argues that use of the tape violated his rights under the Sixth Amendment and the Florida Constitution, but our review of the record shows that he waived these argumentshis sole basis for objection at trial was Miranda. See Terry v. State, 668 So.2d 954, 961 (Fla.1996) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as the legal ground for objection, exception, or motion below.").
[10] For instance, Hauser stated: "Oh, no, no. No threats, no promises, no coercion. No, this is totally my freewill just to set the facts straight."
[11] See Christmas v. State, 632 So.2d 1368, 1370 (Fla.1994) ("When, however, a defendant voluntarily initiates a conversation with law enforcement officers in which a defendant provides information about that defendant's case, Miranda warnings are not required.").