PER CURIAM.
Michael Joseph Griffin appeals an order of the circuit court denying his motion to vacate his conviction for first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. Griffin also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the trial court’s order denying relief on the claims relating to Griffin’s guilty plea and an alleged Brady violation and granting relief on the claim of ineffective assistance of counsel in the penalty phase. We also deny his petition for habeas relief as the claim in the petition should have been raised in the postconviction motion at the trial court and is therefore procedurally barred.
I. FACTS AND PROCEDURAL HISTORY
Griffin pleaded guilty to two counts of first-degree murder in the deaths of husband and wife Tom and Patricia McCallops at the Service America Corporation location in Pinellas County in 1995. Griffin had worked as a service and repair technician for his father’s refrigeration company after he graduated from high school in 1989. Griffin provided service to the refrigerators and coolers at the Service America warehouse for a number of years *895 and became very familiar with its business practices, including that a great deal of cash was deposited daily in lockers at the warehouse by the drivers who collected the coins from vending machines at various sites. When Griffin became addicted to cocaine, he stopped working for his father’s company and moved out of the house he shared with his wife. Griffin moved in with a drug dealer acquaintance, Nicolas Kocolis, and another drug addict named Anthony Lopez.
Griffin came up with a plan to steal money from the Service America lockers and convinced Lopez to assist him. Kocol-is was initially going to participate in the crime, but decided against it. Prior to going to Service America, Griffin traded his gold chain to Kocolis for a nine millimeter pistol that he intended to use during the theft. Griffin also possessed a shotgun that was used during the crime. Griffin realized that he would not be able to get into Service America because of the locked gate and the alarm system. However, Griffin hoped that an employee would recognize him from his past work on the refrigeration equipment and thus let him into the warehouse. Griffin and Lopez waited at a bar across from the warehouse on the night of October 6, but no employee arrived at the warehouse that night. The two men went back to the bar the next night and waited again. Service America employee McCallops and his wife arrived and, as Griffin hoped, McCallops recognized him and let him into the facility. Once inside, Griffin and Lopez wielded their weapons. Lopez locked the husband and wife inside a cooler, while Griffin opened the money lockers with a crowbar. There was some dispute about who actually shot the McCallopses, but both victims were killed by gunshots. Tom sustained one shotgun wound that severed his aorta and four other wounds from a handgun. Patricia suffered two handgun wounds, one in the head and one in the chest. Griffin testified that he heard Lopez shoot Tom with the shotgun when Tom attempted to get up from the floor. However, other witnesses testified that Griffin had stated that he went back inside the facility after the money bags were removed and shot Tom McCallops with the shotgun and then told Lopez to finish the job with the handgun. Immediately after the murders and robbery, Griffin had a party at a hotel suite, where his guests were served champagne and cocaine.
The State informed Griffin’s defense counsel that the victims’ families were amenable to a life sentence if both defendants pled guilty to the murders. Although Griffin denied killing the McCal-lopses, he pled guilty to the charges and accepted the factual basis of the plea. He stated that he felt responsible for what happened because he had taken Lopez with him to Service America. However, Lopez was unable to accept the plea when he developed severe mental problems and was institutionalized in order to restore his competency to stand trial.
At the penalty phase, Griffin waived an advisory jury, any presentence investigation report, and a Spencer[1] hearing. Griffin presented evidence during a two-day penalty phase proceeding before the judge. After hearing evidence and considering memoranda from both sides, the trial court sentenced Griffin to death on both murder counts in July 1998. The trial court found four aggravating factors: (1) a previous conviction of another capital offense (based on the other conviction of first-degree murder of the 'victims); (2) the murders were committed during a kidnapping; (3) the murders were committed to avoid ar *896 rest; and (4) the murders were committed for pecuniary gain. The trial court found the statutory mitigator of no significant prior criminal history. The court also found that Griffin had partly established the mitigating factor that he was an accomplice in the capital felony committed by another; established his family background as a loving son, brother, and father and a hard worker; exhibited good jail conduct and courtroom behavior; and displayed remorse for his actions. The court rejected Griffin’s age of twenty five at the time of the murder and his mental and emotional problems as mitigating factors. While the court found that drug usage and dependency had been established, it gave this very little weight because there was no testimony that Griffin committed the crime while under the influence of drugs or that his ability to comprehend what was going on was impaired by drugs.
On appeal, this Court affirmed Griffin’s convictions and the death sentences. Griffin v. State, 820 So.2d 906, 917 (Fla.2002). Griffin raised three issues on appeal: (1) the validity of his waiver of a jury during the penalty phase; (2) the failure of the trial court to consider his potential for rehabilitation as a mitigating circumstance; and (3) that the kidnapping and pecuniary gain aggravators constituted improper doubling. Even though not raised by Griffin, we also addressed the proportionality, of his death sentences. We found the waiver issue was procedurally barred on appeal because Griffin did not move to withdraw his plea at the trial court. Id. at 913. We found no merit to the two other claims and found the death sentences to be proportionate.
Griffin filed his initial postconviction motion in August 2003, raising eleven claims. The trial court granted an evidentiary hearing on three of Griffin’s claims: (1) that his trial counsel rendered ineffective assistance during the guilt phase; (2) that Griffin was not afforded adequate assistance of a mental health expert; and (3) that counsel rendered ineffective assistance during the penalty phase. The court reserved ruling on a claim of cumulative error, but denied the remaining claims.
After codefendant Lopez’s trial was completed in 2005, Griffin filed an amended motion in which he amended the three claims to be heard at the evidentiary hearing. After the trial judge granted a motion to disqualify himself, the case was assigned to a new judge who also served as the administrative judge for the circuit. Due to this judge’s busy schedule and the large number of witnesses to be heard, the evidentiary hearing was conducted over the course of fourteen months, concluding in February 2008. Griffin filed a number of amended motions, including a new claim of a Brady violation based on the testimony of the hearing witnesses. In September 2007, Griffin also filed a motion to withdraw his guilty plea pursuant to Florida Rule of Criminal Procedure 3.170. In November 2008, the trial court entered an order granting Griffin a new penalty phase proceeding based on the claim of ineffective assistance of counsel during the penalty phase, but denying the remaining claims and Griffin’s motion to withdraw his guilty plea. Sua sponte, the court also addressed the validity of Griffin’s death sentences in light of Lopez’s subsequent life sentences for the same crimes, but concluded that it lacked “sufficient record evidence to satisfactorily weigh the culpability of Defendant Griffin to co-defendant Lopez” and could not say whether the relief granted to Griffin (i.e., a new penalty phase proceeding) might have been further justified by Lopez’s subsequent life sentence.
II. ANALYSIS
Both parties filed timely notices of appeal. Griffin raises several postconviction *897 claims: (1) that he should have been able to withdraw his guilty plea; (2) that counsel rendered ineffective assistance in the guilt phase through various actions that affected Griffin’s decision to accept the guilty plea; and (3) that the State committed a Brady[2] violation based on an alleged immunity deal given to the drug dealer Kocolis for statements he made to the police. On cross-appeal, the State argues that the trial court erred in granting Griffin a new penalty phase proceeding based on ineffective assistance of counsel. Griffin has also filed a habeas petition, claiming that his death sentence is disparate and disproportionate based on the newly discovered evidence of the subsequent life sentence of his codefendant Lopez. We address each claim in turn below.
1. Motion to Withdraw Guilty Plea
Griffin was sentenced to death on July 10, 1998, on each of two counts of first-degree murder. He filed a motion to withdraw plea pursuant to Florida Rule of Criminal Procedure 3.170(¿) on September 25, 2007. The trial court dismissed this motion to withdraw plea, noting that the rule requires that such a motion be filed within thirty days of rendition of sentence and Griffin’s motion was filed nine years after his sentence was rendered. Citing the district court decision in Gafford v. State, 783 So.2d 1191, 1192 (Fla. 1st DCA 2001), the trial court explained that the thirty-day limit is jurisdictional and thus the court did not have the authority to consider Griffin’s rule 3.170G) motion. Griffin argues that the limit is not jurisdictional and that other courts have granted motions to withdraw that were filed outside the rule’s time limit. In particular, Griffin cites this Court’s decision in Kilgore v. State, 688 So.2d 895 (Fla.1996), and the Second District’s decision in Johnson v. State, 834 So.2d 384 (Fla. 2d DCA 2003), as examples where courts have accepted motions to withdraw pleas that were filed outside the thirty-day limit.
Florida Rule of Criminal Procedure 3.170(£) permits a “defendant who pleads guilty or nolo contendere without expressly reserving the right to appeal a legally dispositive issue [to] file a motion to withdraw the plea within thirty days after rendition of the sentence, but only upon the grounds specified in Florida Rule of Appellate Procedure 9.140(b)(2)(A)(ii)(a)-(e).” These grounds include an involuntary plea. However, once sentence has been imposed, a defendant must demonstrate a manifest injustice requiring correction in order to withdraw a plea. State v. Partlow, 840 So.2d 1040 (Fla.2003). The denial of a motion to withdraw plea is reviewed under the abuse of discretion standard. White v. State, 15 So.3d 833, 835 (Fla. 2d DCA 2009).
We conclude that neither Kilgore nor Johnson specifically support Griffin’s argument regarding his rule 3.170(£) motion. In Kilgore, the defendant was indicted for first-degree murder and possession of contraband by an inmate. Kilgore pled nolo contendere to both charges. When a death sentence was announced, Kilgore moved to withdraw his plea on the grounds that his attorney had mistakenly advised him that the death sentence would not be imposed because of the plea. Although Kilgore had already filed a notice of appeal, this Court relinquished jurisdiction to the circuit court in order for it to address the motion. The motion to withdraw plea was granted and Kilgore was subsequently tried by a jury. 688 So.2d at 897. There is no discussion of exactly when Kilgore’s motion to withdraw plea was filed, just that it was filed after sentencing. Thus, Kilgore’s motion to withdraw plea could *898 have been filed within the rule’s time limit and the case does not support Griffin’s argument regarding the time limit.
In Johnson, the Second District determined that it was improper not to allow the defendant to withdraw his plea under the special circumstances of the case, which are very different from those presented here. Johnson pled guilty to two counts of armed robbery without an agreement as to the sentences that would be imposed. Johnson, 834 So.2d at 385-86. Johnson was aware that he faced potential life sentences under the Prison Re-leasee Reoffender Punishment Act (“Act”), but was sentenced to separate thirty-year sentences. The State objected, arguing that life sentences were mandatory under the Act unless one of the statutory exceptions applied. On appeal, the Second District affirmed Johnson’s sentences on the basis that the trial court had discretion to determine whether a defendant should be sentenced as a prison releasee reoffender under the Act. However, this Court quashed the Second District’s opinion on the basis of its decision in State v. Cotton, 769 So.2d 345 (Fla.2000), which held that the Act established minimum mandatory sentences and removed sentencing discretion from the judicial branch. Id. at 385. On remand, the trial court denied Johnson’s attempt to withdraw his plea. On appeal after remand and resentencing to life sentences, the Second District concluded that Johnson should have been permitted to withdraw his plea because it was based on a misapprehension as to the sentences that the trial court could impose. When Johnson entered his plea, both he and his counsel believed that the trial court had discretion to impose something other than mandatory life sentences, that they would have the opportunity to present information supporting the imposition of lesser sentences, and that the judge who accepted the plea had acknowledged that Johnson could present witnesses to speak on his behalf at sentencing to present mitigation. Id. at 385-86. However, because Johnson’s case was remanded by this Court for resentencing under the Act, Johnson sought to withdraw his plea before his sentencing, which would have been pursuant to rule 3.170(f) rather than rule 3.170C) as in the instant case.[3]
Griffin argues that courts have broad discretion in determining motions to withdraw a plea and the court should exercise that discretion liberally in favor of a defendant withdrawing his plea. See, e.g., Adler v. State, 382 So.2d 1298, 1300 (Fla. 3d DCA 1980) (“A motion to withdraw a plea of guilty prior to imposition of sentence should be liberally construed in favor of the defendant.”). However, this is clearly the standard applicable to rule 3.170(f), which expressly states that a court has discretion in this matter “at any time before a sentence.” As this Court explained in Partlow, subdivision (l), which applies to motions to withdraw a plea that are filed after sentencing, “allows withdrawal of a plea only on the limited grounds listed in Florida Rule of Appellate Procedure 9.140(b).” 840 So.2d at 1042. Thus, a court does not enjoy broad discretion as to motions filed after sentencing. *899 A number of district courts have correctly held that failure to file a motion to withdraw the plea within thirty days waives the issue for appellate review, and the defendant is limited to filing a motion pursuant to applicable Florida Rule of Criminal Procedure 3.850 or 3.851. See, e.g., McKnight v. State, 964 So.2d 803, 804 (Fla. 3d DCA 2007); Dayton v. State, 867 So.2d 647 (Fla. 5th DCA 2004); Weidner v. State, 767 So.2d 604 (Fla. 4th DCA 2000).
Therefore, we conclude that the trial court did not abuse its discretion in dismissing Griffin’s rule 3.170(0 motion to withdraw plea and we affirm that ruling.
2. Ineffective Assistance of Counsel Regarding Guilty Plea
The trial court noted that an involuntary plea claim based on ineffective assistance of counsel can be raised pursuant to Florida Rule of Criminal Procedure 3.851 and evaluated under the Strickland[4] test. Griffin raised a postconviction claim regarding the voluntariness of his plea based on ineffective assistance of counsel during the guilt phase proceedings, which he contended rendered his plea involuntary. The court assessed this claim under the two-prong Strickland standard and denied relief on each of Griffin’s five separate arguments regarding counsel’s ineffectiveness, namely: (1) counsel gave him erroneous advice; (2) counsel failed to find and present expert evidence regarding his cocaine use and possible cognitive problems; (3) counsel failed to present evidence that Ko-colis was the mastermind behind the robbery; (4) counsel failed to make a plea offer to the State that did not involve a package deal with Griffin’s eodefendant; and (5) counsel failed to consider and present a voluntary intoxication defense.
In Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the United States Supreme Court established a two-prong test for determining claims of ineffective assistance of counsel relating to guilty pleas. The first prong is the same as the deficient performance prong of Strickland, that is, the defendant must specifically identify acts or omissions of counsel that were manifestly outside the wide range of reasonably competent performance under prevailing professional norms. Hill, 474 U.S. at 58-59, 106 S.Ct. 366; see also Lynch v. State, 2 So.3d 47, 56-57 (Fla.2008). As to the second prong, the Supreme Court held that a defendant must demonstrate “a reasonable probability that, but for counsel’s errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.” Hill, 474 U.S. at 59, 106 S.Ct. 366; see also Grosvenor v. State, 874 So.2d 1176, 1181 (Fla.2004). The defendant does not have to show that he actually would have prevailed at trial, but the strength of the government’s case against the defendant should be considered in evaluating whether the defendant really would have gone to trial if he had received adequate advice from his counsel. Grosvenor, 874 So.2d at 1181. Counsel’s effectiveness is determined according to the totality of the circumstances. Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, in determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at trial. Grosvenor, *900 874 So.2d at 1181-82. “Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.” Lynch, 2 So.3d at 57 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052).
The trial court found that not only the claims relating to counsel’s erroneous advice about the sentence, but also that the claims of failure to investigate Kocolis’ involvement in the crime, failure to seek a plea deal that did not involve codefendant Lopez, and failure to consider or present a voluntary intoxication defense were refuted by the record. The court determined that Griffin failed to demonstrate prejudice on his other claim that trial counsel failed to find and present expert evidence. We address each of these subclaims in turn below.
Griffin contends that his plea was involuntary because counsel led him to believe that he was going to get a life sentence if he entered a guilty plea. While both of Griffin’s trial counsel believed that Griffin would be sentenced to life, they also testified that they understood that the State was seeking the death penalty. The record shows that Griffin entered his plea knowing that he did not have an agreed-upon, guaranteed sentence and that death was the maximum sentence that could be imposed. During the plea colloquy, the trial court advised Griffin that he was facing the death penalty or life without the possibility of parole. The record also shows that counsel consulted with Griffin about his plea, that Griffin knew the potential sentences he was facing, and that he stated that he was entering the plea knowingly and voluntarily. Counsel also testified that Griffin was extremely remorseful and ready to plead guilty even before most of the discovery was complete. At the plea colloquy in December 1997, Griffin expressed his affirmative understanding that the two possible sentences were death and life in prison without the possibility of parole.[5]
Griffin also argues that counsel was ineffective for failing to object to errors and omissions in the plea colloquy. Florida Rule of Criminal Procedure 3.172 governs the taking of pleas in criminal cases. This rule provides basic procedures designed to ensure that a defendant’s rights are fully protected when he or she enters a plea to a criminal charge. Hall v. State, 316 So.2d 279, 280 (Fla.1975). Under rule 3.172(c), a determination of volun-tariness must be made based on a court inquiry to determine that the defendant understands: (1) the nature of the charge and the mandatory minimum and maximum penalties provided by law; (2) that he or she has a right to an attorney and that one will be appointed if necessary; (3) that the defendant has the right to plead not guilty and to be tried by a jury with assistance of counsel, the right to compel attendance of witnesses and to confront and cross-examine witnesses, and the right not to be compelled to incriminate himself or herself; (4) that a plea represents a *901 forfeit of the right to appeal all matters relating to the judgment unless expressly-reserved; (5) that there will be no trial; (6) that the trial judge may examine the defendant under oath about the offense and that the answers may be later used against the defendant; (7) the defendant must meet all terms of any plea agreement; and (8) that a plea may subject the defendant to deportation if he or she is not a United States citizen. See also Gill v. State, 14 So.3d 946, 960-61 (Fla.2009). Notably, the rule also provides that “[f]ail-ure to follow any of the procedures in this rule shall not render a plea void absent a showing of prejudice.” Fla. R.Crim. P. 3.172Q). Mere irregularity in the plea colloquy is not a basis for relief. Lubin v. State, 760 So.2d 241, 242 (Fla. 3d DCA 2000).
Griffin cites two errors in the plea colloquy that resulted in alleged prejudice.[6] While the statements that Griffin cites may have constituted error, Griffin suffered no prejudice from them. See Wuornos v. State, 676 So.2d 966, 969-70 (Fla.1995) (concluding that defendant suffered no prejudice when the State presented without objection a detailed factual basis to accept the plea, the overall thrust of the conversation between the trial court and the defendant indicated that she knew the import of her plea, and the trial court had established that the defendant knowingly and voluntarily signed a detailed form which met all requirements imposed by law). Without objection from Griffin, the State provided a detailed factual basis for accepting his plea;[7] the court conducted a thorough colloquy during which Griffin indicated that he knew the import of his plea; and Griffin knowingly and voluntarily signed the change of plea form. Thus, we affirm the trial court’s denial of this claim.
As to the claim that trial counsel failed to find and present expert evidence for a defense based on cocaine delirium, the *902 court found that Griffin failed to demonstrate prejudice. Griffin presented testimony from two experts at the evidentiary hearing, neurologist Dr. Thomas Hyde and professor of neurology and pharmacology Dr. Deborah Mash. Both experts testified about Griffin’s cocaine use and possible cognitive problems related to a childhood brain injury. The State presented testimony from neuropsychologist Dr. Sidney Merin, who testified that there was no evidence that Griffin suffered from brain damage and that none of Griffin’s IQ scores fell below the average range.
Under Hill, 474 U.S. at 59, 106 S.Ct. 366, prejudice is shown by “a reasonable probability that, but for counsel’s errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.” Where a defendant claims ineffective assistance on the ground that counsel failed to advise him of a viable defense, counsel’s consideration of that defense is relevant to whether counsel performed de-ficiently and also informs the credibility of the assertion that the defendant would have gone to trial if he had been told of the defense. Grosvenor, 874 So.2d at 1181-82. The viability of a defense is also relevant to determining whether counsel performed deficiently. Id. at 1182. In determining whether that reasonable probability exists, a court should consider the totality of the circumstances surrounding the plea, including whether a particular defense was likely to succeed at trial, the colloquy at the time of trial, and the difference between the sentence imposed under the guilty plea and the maximum possible sentence that the defendant faced at trial. Id. at 1181-82.
Griffin has not demonstrated that counsel’s failure to present this expert testimony at trial creates a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial instead. While Griffin’s two experts presented evidence relating to his cocaine use and possible cognitive problems related to his childhood brain injury, they also presented evidence that Griffin’s deliberate actions and planning were not consistent with someone suffering from cocaine delirium. The experts testified that Griffin chose the target of the robbery, was actively involved in planning the robbery, and obtained the weapons used to kill the victims. The experts’ testimony corroborated the physical evidence and witness testimony about Griffin’s involvement. Additionally, Griffin did not present any evidence or testimony that if he had known about this expert testimony, he would not have pleaded guilty. See Lawrence v. State, 969 So.2d 294, 308 (Fla.2007) (concluding that defendant had not demonstrated prejudice relating to guilty plea). Trial counsel also testified that Griffin was remorseful about his involvement in the crime and ready to enter a plea even before the discovery process was complete. The testimony presented at the evidentia-ry hearing confirmed that Griffin’s decision to plead guilty was based on his belief that a plea would provide a better chance of avoiding the death penalty. See Lawrence, 969 So.2d at 308. Moreover, the sentence imposed under Griffin’s plea was the same as .the maximum possible sentence that he faced at trial. See Grosvenor, 874 So.2d at 1182. Thus, Griffin has failed to prove prejudice on this claim and is not entitled to relief.
Griffin also asserts that counsel was ineffective for failing to investigate evidence about Nicolas Kocolis’ involvement in planning the robbery and that Griffin would not have entered a guilty plea if he had been aware of this evidence. The trial court found this claim to be refuted by the record. At the evidentiary hearing, Griffin’s counsel testified that he had hired an *903 investigator to obtain information about Kocolis, but Kocolis was uncooperative and refused to talk to counsel or the investigator. At the evidentiary hearing, Kocolis testified about the statements he had made to the police and the state attorney after the crime, including that Griffin had told him that he knew where there was a large amount of money and had asked Kocolis to help him steal the money. Kocolis also testified that he turned down Griffin’s request. However, when Kocolis was asked questions that could implicate him in the planning or cover-up of the crime, he invoked his Fifth Amendment right against self-incrimination[8] and refused to answer these questions at the evidentiary hearing. Kocolis also asserted that he had been granted immunity by the State for any incriminating information that he gave the police about the crime. An assistant state attorney testified that the State had considered charging Kocolis in the crime, but concluded there was not “enough evidence to be able to make everything stick.” Thus, Kocolis was never prosecuted in connection with this case. Other evidentiary hearing witnesses presented contradictory evidence about Kocolis’ involvement in planning the robbery. However, Griffin’s own penalty phase testimony refuted the allegation that Kocolis was the “mastermind” behind the robbery. Griffin admitted that he came up with the idea for the robbery and planned out the details based on his knowledge of Service America’s business practices and physical layout. Based on this evidence, we agree with the trial court that Griffin is not entitled to relief on this claim.
Griffin argues that trial counsel was ineffective for failing to make a plea offer to the State that did not involve his codefen-dant Lopez. The trial court found this claim to be refuted by the record, and indeed it is. After trial counsel learned that the victims’ family was not in favor of the death penalty, counsel asked if the State would be willing to accept a guilty plea from both codefendants in exchange for life sentences. The State assented, but made it clear that such a plea arrangement was a “package deal,” i.e., both codefen-dants had to enter a guilty plea. Because Lopez became incompetent shortly after his arrest and remained in a state hospital for four years, a joint plea could not be entered. Even so, Griffin’s counsel continued to approach the State with a renewed offer to plead without Lopez. However, the State refused the offer. Thus, counsel’s performance was not deficient in this regard.
Finally, Griffin argues that his trial counsel failed to consider or present a voluntary intoxication defense. The trial court concluded that this claim was refuted by the evidence because counsel did consider the defense, had strategic reasons for not pursuing it, and advised Griffin of the shortcomings of that defense under the facts of his case.
Lead counsel testified that he was aware of Griffin’s cocaine use around the time of the crime and had considered using a voluntary intoxication defense to set up the penalty phase. However, counsel also testified that he considered a voluntary intoxication defense to be a “last resort” because juries were very unlikely to give a person a break for voluntarily taking drugs and using that as a defense for something they then did to another person. Counsel also testified that the evidence showed that Griffin exercised goal-related judgment to increase the likelihood that *904 the robbery would be successful and that he would not get caught. Even though Griffin was using cocaine during the time leading up to the crime, he obtained a firearm, staked out the robbery location, consciously decided not to commit the robbery on the day before because there was no one at the business to help him circumvent the alarm system and the locked gate, drove from Brandon to Oldsmar to commit the robbery, and devised a plan to get around the security system. This evidence belied a voluntary intoxication defense based on cocaine use, which generally causes some lack of control and increased impulsivity. See Stewart v. State, 801 So.2d 59, 65 (Fla.2001) (holding that counsel was not ineffective for failing to present voluntary intoxication defense where counsel determined that defense would be inappropriate given defendant’s detailed account of the crime).
Counsel also testified that he did not think it would be appropriate to set up the penalty phase by presenting a voluntary intoxication defense during the guilt phase because of Griffin’s behavior after the murders. Counsel explained that after Griffin murdered the two victims and left them in the freezer at Service America, he took the money from the robbery, rented a hotel suite, ordered champagne, and threw a party with his friends. Counsel discussed this and the other facts of the case[9] with Griffin before advising him to enter a guilty plea, rather than go to trial with a voluntary intoxication defense. Id. Counsel advised Griffin not to pursue this defense, and Griffin followed his advice. Moreover, counsel’s advice was an informed and reasoned strategic decision based on his judgment that it would not be an effective defense under the facts of the case. Such strategic decisions by counsel will not be second guessed on postconviction. Id.
For the reasons explained above, we affirm the trial court’s denial of postconviction relief on Griffin’s claim that trial counsel rendered ineffective assistance as to his guilty plea.
3. Brady Violation
Griffin also asserts that the State committed a violation of Brady v. Maryland, 873 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), based on an alleged immunity deal given to the drug dealer Kocolis for statements he made to the police. The trial court denied relief on this claim after conducting an evidentiary hearing. The court concluded that Griffin had not been able to establish any of the factors required for a Brady violation.
Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Stridden v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936,144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability suf *905 ficient to undermine confidence in the outcome. Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936.
Postconviction Brady claims present mixed questions of law and fact. Where the trial court has conducted an evidentiary hearing, this Court will defer to the factual findings of the trial court that are supported by competent, substantial evidence, but will review the application of the law to the facts de novo. Sochor v. State, 883 So.2d 766, 785 (Fla.2004); see also Lowe v. State, 2 So.3d 21, 29 (Fla.2008). Moreover, “this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.” Lowe, 2 So.3d at 30 (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997)).
The trial court found Koeolis’ claim that he was granted immunity not credible. This determination is supported by competent, substantial evidence. There was conflicting evidence about whether Koeolis was granted immunity. Koeolis testified that he had been given immunity by the State. However, assistant state attorney Bruce Bartlett testified that he never offered Koeolis immunity and that he did not have authority to offer immunity without getting approval from the state attorney. Bartlett also testified that at one point the state attorney was considering charging Koeolis in the crimes, but did not feel there was enough evidence to make the charges “stick.” Additionally, at the hearing on the motion to supplement Griffin’s postconviction motion to include this Brady claim, Griffin’s counsel stated that during her investigation she had asked Koeolis “point blank” if he had been promised anything by the State and “he said no.”[10] The court determined that Koeolis’ testimony was not credible and Bartlett’s was. See Sochor, 883 So.2d at 785 (deferring to the circuit court’s resolution of the factual component of a Brady claim involving prosecution’s alleged grant of immunity to a witness in exchange for his testimony where there was conflicting testimony by the witness and the prosecutor; the court found the witness’ testimony to be “unreliable and not credible” and the prosecutor’s testimony to be “candid, trustworthy, and credible”). Cf. Kight v. Dugger, 574 So.2d 1066, 1073 (Fla.1990) (“There was sufficient competent evidence adduced at the rule 3.850 hearing to support the trial court’s denial of this [Brady ] claim. While there was conflicting testimony concerning whether the state made concessions in exchange for the informants’ testimony, it was within the trial court’s discretion to find the state’s witnesses more credible than those of the defense.”). As we stated in Sochor, “[w]e cannot say that the circuit court’s decision to discredit the [witness’] evidentiary hearing testimony was unreasonable or unsupported.” 883 So.2d at 786. Thus, we find no Brady violation and affirm the trial court’s denial of relief on this claim.[11]
*906 4. New Penalty Phase
In his postconviction motion, Griffin argued that counsel was ineffective during the penalty phase because he failed to adequately investigate and present mitigating evidence that would have supported a life sentence. The trial court agreed with Griffin and granted him a new penalty phase proceeding. The State has cross-appealed on this issue, arguing that the mitigating evidence presented at the evi-dentiary hearing did not undermine confidence in the outcome of the proceeding and thus the prejudice prong of Strickland was not met.
Following the United States Supreme Court’s decision in Strickland, this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). “When evaluating claims that counsel was ineffective for failing to investigate or present mitigating evidence, this Court has phrased the defendant’s burden as showing that counsel’s ineffectiveness deprived the defendant of a reliable penalty phase proceeding.” Grim v. State, 971 So.2d 85, 99-100 (Fla.2007) (internal quotations omitted); see also Rutherford v. State, 727 So.2d 216, 223 (Fla.1998). “However, along with examining what evidence was not investigated and presented, we also look at counsel’s reasons for not doing so.” Sliney v. State, 944 So.2d 270, 281-82 (Fla.2006). Defense counsel’s reasonable, strategic decisions do not constitute ineffective assistance if alternative courses have been considered and rejected. Henry v. State, 862 So.2d 679, 685 (Fla.2003). However, a reasonable, strategic decision must be based on informed judgment. See Wiggins v. Smith, 539 U.S. 510, 527-28, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (finding counsel’s decision “to abandon their [mitigation] investigation at an unreasonable juncture ma[de] a fully informed decision with respect to sentencing strategy impossible”).
When a guilty plea could not be entered by both of the codefendants in this case, the State did not offer or negotiate a separate plea agreement with Griffin. Even with no guarantees as to sentence, defense counsel advised Griffin to enter a guilty plea, which he did. When it came to light at the beginning of the penalty phase that defense counsel misrepresented the possi *907 ble sentences by telling Griffin that he would be eligible for parole in twenty-five years if he received a life sentence, the trial judge conducted another plea colloquy and informed Griffin that the two possible sentences were death and life without a possibility of parole. After discussing the matter with counsel and his family, Griffin again entered a guilty plea. On counsel’s advice, Griffin waived a penalty phase jury, a penalty phase opening statement, a Spencer hearing, and a presentence investigation report.
At the penalty phase trial, counsel presented witnesses to support a “good guy” defense, that is, Griffin had led a productive and law-abiding life until he got addicted to cocaine. Family members and friends testified about Griffin’s close relationship with his family and his good work ethic. These witnesses also testified about how drugs had drastically changed Griffin’s behavior. Psychiatrist Dr. Michael Maher testified as a mental health expert at the penalty phase proceedings, concluding that the statutory mental health mitigating factors were not applicable. Dr. Maher also testified that Griffin expressed remorse about the victims’ deaths, had used cocaine heavily in the months before the crime, suffered a head injury as a child that left him with abnormal brain functioning and made him vulnerable to other things that would interfere with his brain functioning, and that he had attempted suicide in his teens during a serious depression. Dr. Maher had conducted a general psychiatric interview and a mental status examination of Griffin a few months before the penalty phase began, but had not conducted any brain function tests, did not review medical records related to the head injury, did not review the criminal case records, did not interview Griffin’s associates, and did not review Griffin’s jail records. Dr. Maher stated he did not believe that further testing would change his opinions about Griffin.
Neuropsychologist Dr. Sidney Merin testified for the State at the penalty phase proceeding. Dr. Merin testified that Griffin’s childhood head injury was minor and that the gun pellet never entered the dura mater[12] of Griffin’s brain. Dr. Merin also testified that there was no evidence that the injury caused any brain defect. Dr. Merin based this opinion in part on Griffin’s self-reported high academic performance in school.[13] Dr. Merin also minimized Griffin’s suicide attempt as an “attention-getting device” and found that cocaine use had no effects on Griffin’s judgment. However, Dr. Merin admitted that the only documents he reviewed were the depositions of four witnesses regarding statements that Griffin made after the crime. Dr. Merin did not review any of Griffin’s prior medical or mental health records, did not administer any tests to Griffin, and only conducted one ninety-minute interview with Griffin shortly before the penalty phase.
In sentencing Griffin to death, the trial court gave little weight to Griffin’s lack of criminal history and very little weight to his drug problem. The court noted that there was no testimony that Griffin had committed the crime under the influence of drugs or that his ability to comprehend *908 what was going on was impaired at the time of the crimes. While the court gave great weight to Griffin’s family background, this was based only on evidence that he was a loving son and brother, a hard worker, and a good father. The trial court also concluded that there was no lasting effect from Griffin’s childhood head injury. The court noted that Griffin had been doing fine until he started using cocaine, which negatively changed his life. The trial court characterized Dr. Maher’s testimony regarding emotional and mental problems as “limited,” found this factor had not been established, and gave the factor no weight.
In the order granting postconviction relief on this claim, the court noted that Griffin had presented a wealth of mitigating evidence at the evidentiary hearing, including the severity of his cocaine addiction and the impact it had on his participation in the crimes, his history of depression, the impact of his prior brain injury,[14] and his family history of mental illness and substance abuse addiction. More importantly, the postconviction order noted that counsel’s failure to investigate or present this evidence was based on his belief that Griffin’s guilty plea would result in the trial judge sentencing him to life, especially in light of the State’s initial willingness to enter into a plea with both codefendants for life sentences in exchange for guilty pleas.[15]
At the evidentiary hearing, Griffin’s trial counsel testified that after hearing about the possible plea agreement for both code-fendants, it “colored everything I did afterward.” Griffin’s trial counsel believed that the ultimate sentence would be life, which affected preparation for the penalty phase. Counsel did not compile a family, medical, or social history; did not request a neuropsychiatric evaluation or any type of brain function testing; did not discuss alternative defenses with Griffin; and did not hire the penalty phase mental health expert until late in the process and did not give any of Griffin’s medical records to the expert. Because of this lack of investigation, counsel was not aware of the family history of alcoholism and drug abuse. Counsel also had no independent evidence of the amount or severity of Griffin’s drug use in the hours before the crime and had to rely on Griffin’s self-reports.
At the postconviction hearing, a number of witnesses testified about Griffin’s cocaine and drug use, including on the day of the crimes. These friends and family members testified that Griffin was using cocaine daily in the summer of 1995, that he started using other substances as well, and that he exhibited progressively strange behavior and mental instability. According to several of these witnesses, Griffin had been using cocaine continually for days before the robbery and right up to the time he left to commit the robbery. Family members also related an extensive family history of substance abuse, alcoholism, and mental illness. Griffin’s mother testified about his head injury and its effects, including that Griffin was no longer permitted to participate in contact sports *909 and suffered from depression and headaches on a regular basis after the injury. Medical records presented at the hearing confirmed that the gun pellet penetrated Griffin’s brain, that he had to have a cra-niotomy, and that he was prescribed Dilan-tin for two years as a prophylactic for seizures that are often secondary to such head injuries.
The testimony of the mental health experts at the postconviction hearing support Griffin’s claim that he suffered from cocaine dependence during the six months prior to the crime, that his childhood brain injury was significant and may have caused lasting effects, that his family history of substance abuse and mental illness made him more susceptible to the effects of cocaine abuse, and that his low academic performance in school indicated low right hemisphere functioning, which would make him more prone to depression and impul-sivity. The two experts also opined that two statutory mental mitigating factors were applicable to Griffin.
The evidence presented at the evi-dentiary hearing goes directly to some of the mitigating factors that the sentencing court gave little weight and supports other mitigating factors that the court found had not been established at all. Had the trial judge been presented with evidence about the severity of Griffin’s drug use, his use of drugs at the time of the crimes, his family history of alcohol and drug abuse and mental illness, his history of depression, and the impact of his prior brain injury, there is a reasonable probability that the result of the penalty phase proceeding would have been different, that is, “a probability sufficient to undermine confidence in [that] outcome.” Porter v. McCollum, 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). Moreover, Griffin’s trial counsel was unable to rebut some of the erroneous statements [16] made by the State’s expert at the penalty phase because counsel never obtained Griffin’s medical or school records. This erroneous evidence could have influenced the sentencing court’s conclusion that Griffin suffered no lasting effects from his head injury.
The record supports the trial court’s conclusion that “counsel’s penalty-phase strategy, or lack thereof, was clearly based on an unsubstantiated hunch that if the Defendant entered a straight-up plea the trial judge would sentence him to life and not death.” Counsel’s “hunch” was no basis for an informed strategy as it limited his investigation of possible mitigating evidence. The failure to present this available mitigating evidence undermines the confidence in the sentence imposed. Thus, we agree with the lower court that Griffin is entitled to a new penalty phase proceeding based on counsel’s deficient performance and the prejudice it caused.
5. Sentence Disparity
Griffin has also filed a habeas petition, claiming that his death sentence is disparate and disproportionate based on the newly discovered evidence of the subsequent life sentence received by his code-fendant Lopez. The trial court sua sponte addressed this issue in its postconviction order, concluding that there was not sufficient record evidence to weigh Griffin’s culpability against Lopez’s. However, in light of the new penalty proceeding required by counsel’s ineffective assistance during the penalty phase, the trial court *910 noted that the relief may or may not have been further justified by the Court’s precedent in Scott v. Dugger, 604 So.2d 465 (Fla.1992).
In Scott, this Court held that “in a death case involving equally culpable codefen-dants the death sentence of one codefen-dant is subject to collateral review under rule 3.850 when another codefendant subsequently receives a life sentence.”[17] Id. at 469. Scott involved two codefendants who “had similar criminal records, were about the same age, had comparable low IQs, and were equally culpable participants in the crime.” Id. at 468. Both were charged and convicted of first-degree murder, robbery, and kidnapping. Initially, both men were sentenced to death, but the codefendant’s death sentence was vacated on direct appeal by this Court and on remand the codefendant was resen-tenced to life. Id. Scott’s postconviction motion sought to have his own death sentence vacated as disproportionate, disparate and invalid in light of his codefen-dant’s subsequent life sentence, which he characterized as “newly discovered evidence.” The circuit court summarily denied relief on this claim, finding it untimely and improper under rule 3.850. Id.
On appeal, this Court explained that “[ejven when a codefendant has been sentenced subsequent to the sentencing of the defendant seeking review on direct appeal, it is proper for this Court to consider the propriety of the disparate sentences in order to determine whether a death sentence is appropriate given the conduct of all participants in committing the crime.” Id. (citing Witt v. State, 342 So.2d 497, 500-01 (Fla.1977)). The Court extended this disparity review to Scott’s postconviction proceedings because his codefendant’s subsequently imposed life sentence met the two requirements of newly discovered evidence. First, the asserted fact of the co-defendant’s life sentence was “unknown by the trial court, by the party, or by counsel at the time of trial, and ... defendant or his counsel could not have known them by the use of diligence.” Id. (quoting Hallman v. State, 371 So.2d 482, 485 (Fla.1979) abrogated on other grounds, Jones v. State, 591 So.2d 911 (Fla.1991)). Second, the codefendant’s life sentence was of such a nature that it would probably result in a life sentence being imposed. Id. This second requirement is met when the codefen-dants are equally culpable participants in the crime, as “[defendants should not be treated differently upon the same or similar facts.” Slater v. State, 316 So.2d 539, 542 (Fla.1975).
Under Scott, Lopez’s subsequently imposed life sentence constitutes “newly discovered evidence” that would be cognizable in a postconviction motion by Griffin. However, Griffin did not raise this claim in his postconviction motion to the court below. Instead, he has raised it in a habeas petition to this Court. “[Cjlaims of newly discovered evidence should be raised in a postconviction motion filed pursuant to rule 3.850 rather than in a petition for habeas corpus.” Thompson v. State, 759 So.2d 650, 668 n. 13 (Fla.2000); see also Steinhorst v. Singletary, 638 So.2d 33, 34 (Fla.1994). Even though Griffin filed several amended postconviction motions, he never included a claim based on the disparity of Lopez’s life sentence. A postcon-viction claim of newly discovered evidence based on Lopez’s subsequently imposed life sentence would have to be filed “within *911 one year of the date upon which the claim became discoverable through due diligence.” Jimenez v. State, 997 So.2d 1056, 1064 (Fla.2008). Lopez’s life sentence was imposed in January 2004. Griffin admits that he received records from Lopez’s trial in July 2005 and based upon these records he amended the three claims which were to be considered at the postconviction evi-dentiary hearing. A newly discovered evidence claim based on Lopez’s life sentence would have been timely if filed by July 2006. Thus, had Griffin amended his post-conviction motion with a timely claim based on Lopez’s subsequent life sentence, the trial court could have included this claim in the evidentiary hearing. Instead, the trial court sua sponte addressed Lopez’s life sentence in its postconviction order, noting that Griffin did not affirmatively plead the issue and concluding that the court lacked “sufficient record evidence to satisfactorily weigh the culpability of Defendant Griffin to co-defendant Lopez.”
Griffin contends that the trial court’s sua sponte consideration of this issue recognizes his “dilemma” in being able to bring this claim. He also asserts that the court “deferred” the disparate treatment/proportionality review to this Court because it had insufficient record evidence to weigh the relative culpability of the codefendants. Neither of these assertions is true. The trial court did not characterize the issue as a dilemma and did not state that it was deferring review to this Court. The order simply states that Griffin did not affirmatively plead the issue and thus the court lacked a sufficient record to weigh the codefendants’ culpability. Griffin further alleges that he “could not have presented his claim of disparate treatment to this Court until now,” thereby seeking to avoid the time bar applicable to a claim of newly discovered evidence. A petition for extraordinary relief is not a second appeal and cannot be used to litigate or relitigate issues that were or could have been raised on direct appeal or in prior postconviction proceedings. Wallace v. McNeil, 50 So.3d 603 (Fla.2010). As noted above, there was no impediment to Griffin timely amending his postconviction motion to include this claim after he learned of Lopez’s life sentence. Accordingly, we deny Griffin’s petition for habeas relief as procedurally barred.[18]
III. CONCLUSION
For the reasons explained above, we affirm the trial court’s postconviction order dismissing Griffin’s motion to withdraw his guilty plea, denying his claims relating to his convictions, and granting him a new penalty phase proceeding based on ineffective assistance of counsel. We also deny his petition for habeas corpus relief as procedurally barred. We vacate Griffin’s sentence of death and remand the case for a new penalty phase proceeding.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., and LEWIS, and CANADY, JJ., concur in result.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Johnson does not expressly state under which rule relief was sought. However, the opinion does state that a trial court should allow a defendant to withdraw a plea when the defendant establishes that the plea was entered “under mental weakness, mistake, surprise, misapprehension, fear, promise, or other circumstances affecting the defendant's rights.” 834 So.2d at 385. This is the standard set forth for motions filed under rule 3.170(f) which might be based on any one or a combination of grounds. Further, the cases cited by the Second District in Johnson for this proposition involved motions filed under rule 3.170(f).

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. The original plea form erroneously provided that a life sentence would be for a twenty-five year minimum mandatory term, which was not the law at the time Griffin committed the murders or when he entered his guilty plea. When this error was brought to the judge's attention at the beginning of Griffin’s penalty phase proceeding in December 1997, the judge took a brief recess and permitted counsel to discuss this matter with Griffin and his family members in the courtroom. After the recess, the judge conducted a colloquy as to Griffin’s understanding that the two possible sentences were death and life without possibility of parole. Griffin expressed his affirmative understanding as to the two possible sentences and still chose to enter a guilty plea.

. First, the trial judge mischaracterized the role of the penalty phase jury when he stated that the jury could still recommend a death sentence "after hearing the aggravating circumstances” but without mentioning that the jury would also hear the mitigating circumstances. Second, the trial judge erroneously stated that Griffin's plea would preclude him from challenging "counsels’ job as it relates to the guilt phase.” Trial counsel did not object to either statement.

. The prosecutor presented the following factual basis for accepting Griffin’s plea. Griffin, along with codefendant Anthony Lopez, had been charged in a two-count indictment for an offense that occurred on October 7, 1995, at the Service America on Gim Gong Road in Oldsmar, Pinellas County, Florida. Griffin and Lopez entered the business of Service America by trickery and deceit. Griffin had previously worked for a company that had a contract to repair freezers at Service America and was thus known by several of the warehouse employees at Service America. Griffin and Lopez went to the front gate of the business during the evening hours of October 7, 1995. Tom McCallops, who was a warehouse employee at Service America, and his wife Patricia McCallops, who was not employed by Service America but was substituting for one of the truck drivers, were present at the business. Tom McCallops knew Griffin, who entered under the guise of fixing one of the freezers. The McCallopses were walked at gunpoint to one of the coolers and locked inside. Griffin and Lopez forcefully opened several metal money lockers at Service America and removed in excess of $8,000 in United States currency. After removing the money, Griffin and Lopez returned to the cooler and fired their guns at the McCallopses from the door of the cooler. Both Tom and Patricia McCallops died from the gunshots fired by Griffin and Lopez. Griffin's blood was found on one of the metal lockers and also on the floor. Both Griffin and Lopez admitted their involvement to several of their friends, but made no confessions to law enforcement after their arrest. Griffin’s counsel stated that these were the facts as he understood them based on his discovery.

. "No person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const, amend. V.

. These facts included: witnesses identified Griffin as the driver of the van used in the robbery; tire tracks at the crime scene matched Griffin’s van; shotgun shells, money wrappers and other evidence linking Griffin to the crime were found in his van; and State witnesses would testify that Griffin had admitted his participation in the shootings.

. The State argued that the claim was not timely because Griffin’s postconviction counsel "knew or should have known” about the alleged immunity deal as Koeolis was Griffin's witness at the evidentiary hearing and postconviction counsel had interviewed him in preparation for filing the rule 3.851 motion. Postconviction counsel responded that she did inquire about promises or deals with the State and that Koeolis had denied that any were made.

. Even though the trial court concluded that there was no immunity granted to Koeolis, the court still addressed the other Brady requirements, finding neither. First, because the court found Koeolis’ claim of immunity was not credible, it did not find that the information had been suppressed. Second, *906 the court concluded that even if Griffin had proven that Kocolis received immunity, he could not show prejudice from the non-disclosure of such evidence. We agree. Griffin admitted that he came up with the plan to target Service America, used his knowledge of the facility to develop a plan for the robbery, procured the weapons used in the robbery, drove the vehicle used in the crimes, and needed the money because of his financial problems. Even though Griffin maintained that he had not been the shooter, other witnesses testified that he admitted shooting the victims. Griffin admitted that he disposed of the weapons after the murders. The physical evidence also tied Griffin to the scene, including tire tracks from his van at the scene and shell casings and money wrappers found in his van. Cf. Pardo v. State, 941 So.2d 1057, 1066 (Fla.2006) (stating that defendant's testimony admitting the killings put the nondisclosure of videotaped interview of state witness in a less prejudicial light under Brady; also noting forensic evidence that strongly implicated defendant in murders).

. The dura mater is the outermost of the three layers of the meninges surrounding the brain. The dura mater lies under the skull.

. Dr. Merin testified that Griffin had maintained a 3.3 grade point average, based on Griffin’s self-report. However, school records show that Griffin actually had a 1.89 grade point average. Trial counsel did not correct this error, presumably because counsel was unaware of Griffin's true academic performance because he never obtained any of Griffin’s records.

. Medical records show that Griffin was shot in the right parietotemporal area of the head with a pellet gun when he was nine years old. He had to have brain surgery to remove pieces of skull and hair from his brain and was hospitalized for three to four weeks.

. The State initially offered a plea agreement — life sentences in exchange for both co-defendants pleading guilty. However, the terms of that plea agreement were contingent on both codefendants pleading. Because Lopez was not able to enter a plea because of his incompetency, the plea agreement was never executed. Instead, Griffin’s counsel advised him to enter a guilty plea without any agreement with the State, which he did.

. Dr. Merin testified erroneously that the gun pellet never entered Griffin’s brain and that Griffin had maintained a 3.3 grade point average in school. While Dr. Merin admitted that he had not reviewed any of Griffin's records, trial counsel was not able to confront him with the true facts from the records because counsel never obtained these records.

. At the time that the Court issued its opinion in Scott, all postconviction motions were governed by Florida Rule of Criminal Procedure 3.850. The Court subsequently created Florida Rule of Criminal Procedure 3.851 which governs postconviction motions in death penalty cases.

. Because Griffin has been granted a new penalty phase proceeding, he can raise Lopez’s life sentence as a factor to be considered in that proceeding.